[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 38.]

THE STATE EX REL. OHIO ALUMINUM INDUSTRIES, INC., APPELLANT, *v.*
CONRAD, ADMR., BUREAU OF WORKERS' COMPENSATION, APPELLEE.
[Cite as *State ex rel. Ohio Aluminum Industries, Inc. v. Conrad*,
2002-Ohio-5307.]

*Workers' compensation—State Insurance Fund—Occupational classifications—*
*Bureau's reclassification of nonferrous metal foundry's classification*
*number resulting in a higher premium affirmed, when.*

(No. 2001-0315—Submitted July 24, 2002—Decided October 16, 2002.)

APPEAL from the Court of Appeals for Franklin County, No. 99AP-1060.

————————————

**Per Curiam.**

{¶1} Appellant, Ohio Aluminum Industries, Inc. ("OA"), makes high-precision products for the military, automotive, and aerospace industries. After the pieces are cast, they undergo rigorous testing and inspection. Machining and milling are sometimes required.

{¶2} In 1982, appellee, Ohio Bureau of Workers' Compensation, inspected OA's plant to determine the appropriate manual classifications for OA's risk for purposes of fixing OA's premium rate. The report discussed various foundry activities and noted that the plant had a machine shop that was physically separated from the castings manufacturing plant. Employees who worked in the machine shop had a payroll that was segregated from the others for premium purposes.

{¶3} The report made two relevant assignments. Manual classification number 3085 was assigned to employees doing actual casting and foundry work. Classification number 3632—with a lower basic premium rate—was assigned to those working in the machine shop.

**{¶4}** In October 1996, the bureau did a premium audit on OA. The audit revealed:

**{¶5}** "Risk [OA] has not had a machine shop at its foundry for the last three years since all its machine shop work is done at its sister company. Risk's controller admits that it does not have any cost accounting processing under a machine shop account or any direct labor assigned to a machine shop account classification. Both the safety manager (Rocco Paladino) and the controller (Mike Fornick) admit that the machine shop has been closed down at this location for three years."

**{¶6}** Manual classification number 3632 was therefore discontinued from OA's premium calculation, resulting in a higher rate.

**{¶7}** OA contested these findings, arguing that its business had not changed since the 1982 audit/inspection that had added number 3632 to OA's risk. On December 9, 1997, the matter was heard by the bureau's adjudicating committee. It concluded:

**{¶8}** "[E]mployer's primary line of business is that of an aluminum foundry and * * * the molding, finishing, and core room operations are incidental thereto, and therefore the employer should be classified under Manual No. 3085 * * *."

**{¶9}** OA appealed and was heard by the bureau administrator on February 5, 1998. The adjudicating committee's findings and order were affirmed. On February 19, 1998, another plant inspection occurred. The inspector remarked:

**{¶10}** "NCCI [National Council on Compensation Insurance, Inc.] states that the inspection process is incidental to the foundry. Although this employer's inspection process is more extensive than the manufacturing process, NCCI does not appear to make allowances for these operations to be separately classified. *There was no apparent need for the machine shop classification*." (Emphasis added.)

**{¶11}** On April 6, 1998, the administrator mailed his order affirming the adjudicating committee order. OA took no further action.

**{¶12}** On November 16, 1998, the bureau sent a letter to OA confirming that number 3632 had been "deactivated" on OA's State Fund policy effective January 1, 1998. The next day, the bureau sent OA another letter, stating that 3632 was deactivated from July 1, 1994 through July 1, 1997. It also said, however, that 3632 was reinstated as of November 17, 1998. There was no explanation of the latter.

**{¶13}** OA filed a complaint in mandamus in the Court of Appeals for Franklin County. Around the same time, OA received further bureau correspondence informing it that 3632 had been reactivated effective January 1, 1999. Again, no explanation accompanied this action.

**{¶14}** On February 29, 2000, the bureau moved the court of appeals for leave to supplement the record with a February 14, 2000 bureau letter to OA explaining that the November 17 letter had contained an error, i.e., that 3632 had never been "reinstated." The letter attributed the mistake in part to a computer glitch and in part to OA's continued use of number 3632 in its payroll reports.

**{¶15}** The court of appeals granted the motion, prompting OA's motion to supplement the record with two affidavits from OA employees denying that the machine shop had ever been moved. OA's request was overruled.

**{¶16}** This cause is now before this court upon an appeal as of right.

**{¶17}** Section 35, Article II of the Ohio Constitution authorizes the board to "classify all occupations, according to their degree of hazard * * *." Implemented by what is now R.C. 4123.29(A)(1), the result is the Ohio Workers' Compensation State Fund Insurance Manual. The manual is based on the manual developed by NCCI and has hundreds of separate occupational classifications. See Ohio Adm.Code 4123-17-04, Appendix A. It also specifies the basic rate that an employer must pay, per $100 in payroll, to secure workers' compensation for its employees. See Ohio Adm.Code 4123-17-02(A).

**{¶18}** Currently at issue are classification numbers 3085 and 3632. The former is very specific, governing nonferrous metal foundries. The latter is basically a catchall provision for machine shops. It is entitled "Machine Shop NOC [Not Otherwise Classified]," which means that it applies "only if no other classification more specifically describes the insured's business." Ohio Adm.Code 4123-17-08(C)(2)(g).

**{¶19}** In 1982, the bureau designated OA's postcasting machining, i.e., grinding, filing, heat-treating, etc., as 3632 activities. In 1996, a bureau audit found insufficient on-site postcasting activities to continue assigning 3632 as a separate classification. This conclusion was based on three things: (1) the absence of a separate and distinct machine shop (as contrasted with 1982), (2) statements from two plant officials that the machine shop had relocated, and (3) OA's lack of any cost-accounting processes or direct labor assigned to a machine-shop account. It is around these points that our controversy revolves.

**{¶20}** OA has an uphill battle from the outset. That is because "[t]he bureau is afforded a 'wide range of discretion' in dealing with the 'difficult problem' of occupational classification." *State ex rel. Roberds, Inc. v. Conrad* (1999), 86 Ohio St.3d 221, 222, 714 N.E.2d 390, quoting *State ex rel. McHugh v. Indus. Comm.* (1942), 140 Ohio St. 143, 149, 23 O.O. 361, 42 N.E.2d 774. Thus, we have "generally deferred to the [bureau's] expertise in premium matters" and will find an abuse of discretion "only where classification has been arbitrary, capricious or discriminatory." *State ex rel. Progressive Sweeping Contrs., Inc. v. Ohio Bur. of Workers' Comp.* (1994), 68 Ohio St.3d 393, 396, 627 N.E.2d 550. We find that the present declassification was reasonable.

**{¶21}** All activities relevant to this inquiry occur after the aluminum has been cast. The 1998 plant inspection indicated that extensive postcasting inspection and testing were done on the high-precision pieces OA produces. It also stated that

4

"some orders require machining and milling." OA argues that these activities fall under 3632 both definitionally and because they mirror those so classified in 1982.

**{¶22}** In describing some of the activities that can fall under 3632, the manual states:

**{¶23}** "Metal castings, forgings, bars, rods, flats, tubing, angles, pipe and pipe fittings, chains, sockets, gears, shafting, pulleys, hardware, sheet metal and some lumber and paint may be used. A variety of processes may be involved such as boring, turning, planing, shaping, milling, drilling, punching, grinding, tapping, threading, shearing, bending, forming, riveting, welding, painting, inspecting and testing."

**{¶24}** Undoubtedly, inspecting, testing, and various machining processes are included within the scope of classification number 3632. OA, however, misses two key points. First, the provision uses the term "may" not "must," negating any claim of mandatory inclusion. Second, the manual's scope provision for 3632 opens as follows:

**{¶25}** "Code 3632 applies to the manufacture or repair of machines as well as general job machining. It must be emphasized that Code 3632 is an NOC classification and is applied to operations only when such operations are not specifically contemplated by another manual classification(s)." NCCI Scopes of Basic Manual Classifications (Jan. 2001) 117.

**{¶26}** That point is again stressed near the close of the description of 3632's scope:

**{¶27}** "Certain Code 3632 operations are designated as 'not otherwise classified' (NOC). These NOC operations shall apply to an insured only when no other classification more specifically describes the insured's operations." Id. at 118.

**{¶28}** Contrary to OA's representation, the postcasting activities at issue may well be contemplated by number 3085, eliminating 3632 applicability. As

explained in the NCCI Scopes Manual, Code 3085 "is applied to foundries engaged in the manufacture of castings from brass, aluminum or other non-ferrous metals * * *. The classification includes wood or metal pattern making, core and mold making, melting of the non-ferrous metals in furnaces and the pouring of the molten metal into molds. After the castings are cooled they generally receive *some machining* to remove burrs or imperfections. The finished castings are then *inspected*, packed and shipped." (Emphasis added.) Id. at 103.

{¶29} Given this language, we do not find that the bureau abused its discretion in classifying postcasting functions under the general number 3085. Because it is not unreasonable, we defer to the bureau's determination.

{¶30} OA also challenges the presence of "some evidence" to support the bureau's findings. We reject this challenge.

{¶31} The 1982 classification of OA's machine shop under 3632 was premised on three things: (1) a physically separate machine shop, (2) payroll segregation of the machine shop from the foundry, and (3) the apparent volume of work occurring in the shop. The 1996 declassification was based on changes to one and three. That audit report found that most of the postcasting machining was being done elsewhere—so much so that what remained was deemed incidental and included in the main foundry activity.

{¶32} The 1996 report was based on, among other things, statements from two plant officials, Mike Fornick and Rocco Paladino, indicating that the machine shop had closed three years earlier. Most of the criticism leveled at this report and these statements is that they did not conform to the Rules of Evidence. This fails because the Rules of Evidence do not apply to this bureau proceeding. R.C. 4123.10.

{¶33} Equally important, the probity of these two statements is enhanced by two things: (1) the 1997 hearing challenging the 3632 deletion, at which Fornick was present, and (2) the bureau's 1998 in-plant inspection. Both events presented

opportunities for OA to establish its continued entitlement to the 3632 classification.

{¶34} These two missed opportunities also undermine OA's assertion that it was prejudiced by the court of appeals' refusal to allow OA to supplement the record with affidavits from Fornick and Paladino. These affidavits deny that the bulk of postcasting machining had been moved. Fornick, however, had already had the chance at the 1997 hearing to rebut the earlier statement that had been attributed to him, and he apparently either did not try or was not successful. So, too, is the case with the 1998 inspection. That evaluation obviously confirmed what Fornick allegedly said in 1996. To exclude an affidavit that attempted to contradict what an auditor had already visually confirmed was not improper. Accordingly, the court of appeals' denial of OA's motion to supplement was not error.

{¶35} OA is also highly critical of the court of appeals' consideration of the February 14, 2000 letter that describes the November 17, 1998 and September 16, 1999 letters as mistakes, asserting procedural and evidentiary irregularities. This argument seems irrelevant given the lack of reliance placed upon the letter by the court of appeals. Equally important, the letter simply expressed what the facts already suggested—that the November 1998 and September 1999 letters reinstating number 3632 were erroneously generated.

{¶36} OA overlooks the circumstances surrounding these documents. When the bureau conclusively removed classification 3632 from OA's risk assessment in the spring of 1998, OA did nothing to contest that determination. Then, out of the blue, came a November letter—the first of two—reinstating 3632 without explanation. Considering the vigorous contention over the issue, this letter should have raised a red flag with OA. OA instead decided to gamble on this fortunate turn of events rather than inquire as to what generated this surprising reversal. Thus, contrary to OA's representation, the 2000 letter presented little that could be realistically considered new. As the magistrate wrote:

**{¶37}** "The letter of November 16, 1998, is consistent with the investigation and audit reports of 1996 and 1998, respectively. The unexplainable letter which is not based on any evidence in the record was generated by the BWC on November 17, 1998. That letter reactivated manual classification M3632 without giving any explanation whatsoever. In fact, that letter could not have provided any explanation for reactivating manual classification M3632 because there simply is no evidence in the record to substantiate any rationale for the BWC to reactivate manual classification M3632. With or without the additional evidence submitted by the BWC explaining that the letter of November 17, 1998 was generated in error, there is no other conclusion to which anyone could come to [sic] but that the November 17, 1998 letter was generated in error."

**{¶38}** OA's final procedural objection is directed at the court of appeals' decision to allow the bureau to amend its answer once the bureau realized that the two mistakenly sent letters might imply an admission that OA had a machine shop over the contested period.

**{¶39}** Civ.R. 15(A) directs that leave to amend "shall be freely given when justice so requires." The bureau accurately observes that "[t]he true facts of this case do not reveal any prejudice whatsoever to [OA], other than its not being able to place reliance upon a faulty sentence in a letter generated by computer glitch." Accordingly, leave to amend was not granted in error.

**{¶40}** The judgment of the court of appeals is affirmed.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

Buckley, King & Bluso, Robert F. Deacon and M. Scott Young, for appellant.

Betty D. Montgomery, Attorney General, and Gerald H. Waterman, Assistant Attorney General, for appellee.

_____