ARTH BRASS & ALUMINUM CASTINGS, INC., APPELLANT,
*v.* CONRAD, ADMR., APPELLEE, ET AL.

[Cite as *Arth Brass & Aluminum Castings, Inc. v. Conrad,* 104 Ohio St.3d 547, 2004-Ohio-6888.]

(No. 2003–0001—Submitted January 13, 2004—Decided December 22, 2004.)

PFEIFER, J.

## Factual and Procedural Background

{¶ 1} Appellant, Arth Brass & Aluminum Castings, Inc. ("Arth"), is a private employer that participates in the State Insurance Fund for workers' compensation. Arth is merit-rated and, at all times pertinent, was a part of a group-experience rating program sponsored by the Greater Cleveland Growth Association's Council of Smaller Enterprises ("COSE"), a trade association of which Arth is a member.

{¶ 2} Arth appeals from a judgment of the Franklin County Court of Appeals affirming the dismissal of Arth's declaratory-judgment action against appellee James Conrad, the Administrator of Workers' Compensation. In the declaratory judgment action, Arth contested the Bureau of Workers' Compensation's charging of Arth's employer-risk account for the amounts paid in medical benefits to an injured employee prior to the resolution of Arth's appeal of the employee's claim. An employer's risk account is the bureau's individualized account of those losses incurred against the State Fund on account of injuries, occupational disease, and death of the employees of that employer.

{¶ 3} This case arises out of a claim filed by Nuncio Ayala, an Arth employee, who requested payments of disability compensation and medical benefits due to bilateral carpal tunnel syndrome he allegedly contracted or sustained in the course of his employment. Following formal hearings, Industrial Commission district and staff hearing officers allowed Ayala's claim for an occupational disease described as "bilateral carpal tunnel syndrome."

{¶ 4} On March 11, 1998, pursuant to R.C. 4123.511(D) and (E), Arth appealed to the Industrial Commission from its staff hearing officer's decision. The commission refused to hear Arth's appeal. Thus, Arth appealed the staff hearing officer's order to the Cuyahoga County Court of Common Pleas, pursuant to R.C. 4123.512(A).

{¶ 5} While Arth's action was pending in the trial court, the bureau, between July 1, 1998, and July 1, 1999, made various payments to Ayala's medical providers totaling $9,395. On July 1, 1999, that amount was charged to Arth's risk account. Similarly, from July 1, 1999, to July 1, 2000, the bureau made further payments totaling $1,102 to Ayala's health-care providers, and again

charged that amount to Arth's risk account. The total amount charged to Arth's account over two years was $10,497.

{¶ 6} Upon receiving notice that the administrator had imposed those charges against its risk account while its R.C. 4123.512 appeal was pending, Arth filed a formal letter of protest with appellee pursuant to Ohio Adm.Code 4123–17–27 challenging the charges. Arth argued that charges could not be made against its account before a final order allowing Ayala's claim. The administrator eventually rejected this protest by final order on October 24, 2000.

{¶ 7} Based on that final order, Arth filed this declaratory judgment action on December 11, 2000, in the Franklin County Court of Common Pleas. The next day, the Cuyahoga County Court of Common Pleas ruled in the underlying case that Ayala was not entitled to any workers' compensation benefits for his claim. That determination was certified to the Industrial Commission and, in accordance with R.C. 4123.512(E), became the commission's final order in Ayala's claim. On February 15, 2001, the bureau credited Arth's risk account with the $10,497 in medical payments that had been charged to it due to the allowance of Ayala's claim by the commission's staff hearing officer.

{¶ 8} Meanwhile, Arth's declaratory judgment action continued. Arth argued that an injured worker's health-care providers cannot lawfully be paid until there has been a final adjudication of the claim as defined by R.C. 126.30(D). Further, Arth argued, an employer's risk account cannot be charged with the amount paid for medical bills until a final adjudication.

{¶ 9} Arth claimed that appellee's charging of Ayala's medical bill payments against its risk account before a final adjudication adversely affected it in two different ways. First, Arth alleged that it was obligated to appellee for more than its true premium obligation in order to maintain individualized State Fund coverage. Arth claims that it paid premium amounts of "approximately $1,000.00 more" for fiscal year 2000 coverage and "approximately $1,273.00" more for fiscal year 2001 coverage.

{¶ 10} Second, Arth alleged that appellee's action affected its group rating within its group. A State Fund employer can join a group for purposes of calculating the amount of its premium that it must pay to the State Fund. R.C. 4123.29(A)(4). Pursuant to R.C. 4123.29(A)(4), an employer must be affiliated with a qualified sponsor organization to be eligible for group rating. Arth's sponsoring organization is COSE. A third-party administrator, Integrated Consulting Services ("ICS"), administered COSE's group rating system, assigning member employers into different groups. Two of the groups sponsored by COSE were Manufacturing Group A and Manufacturing Group B.

{¶ 11} Arth claims that it suffered additional adverse premium obligation costs because applying Ayala's medical charges to Arth's risk account caused it to be

improperly moved to a higher cost premium-rate-group-experience rating than it would have without the imposition of the additional charges to its risk account. Prior to the charge of Ayala's medical payments to Arth's risk account, Arth was a part of Group A. After the charge to its risk account, Arth was transferred into Group B, a group whose employers paid higher premiums than those in Group A. Arth alleges that it paid additional premiums of $8,956 for policy year 1999 coverage and $9,401 for policy year 2000 group-rating coverage.

{¶ 12} The parties each filed summary judgment motions in the declaratory judgment action, and the trial court granted the bureau's. The trial court found that R.C. 4123.511(I) determines when medical bills become payable; that R.C. 126.30 does not prevent the bureau from paying medical bills prior to a final adjudication; that the bureau may charge an employer's risk account in accordance with R.C. 4123.34 during the pendency of an employer's appeal pursuant to R.C. 4123.512; that the bureau properly credited Arth's risk account for all amounts that had been charged to it; and that the bureau was not required to make a further credit to Arth's account, or to otherwise reimburse Arth, due to Arth's payment of increased premiums.

{¶ 13} Arth appealed the trial court decision to the Franklin County Court of Appeals. On November 19, 2002, the appellate court affirmed.

{¶ 14} The cause is before this court upon the acceptance of a discretionary appeal.

## Law and Analysis

{¶ 15} We address three issues in this case: (1) At what point in the claims process may the bureau pay a claimant's medical bills? (2) Once the bureau pays a claimant's medical bills, when may it charge an employer's risk account for those payments? and (3) When medical bills are paid on a claim that is ultimately disallowed, to what extent must the bureau credit an employer whose risk account has been improperly charged? We address these issues in order.

### I

{¶ 16} Central to the issue of when the bureau may properly pay medical benefits to health-care providers on behalf of claimants is whether R.C. 4123.511(I) or 126.30(D) controls. The bureau argues that R.C. 4123.511(I) governs the issue. That statute reads:

{¶ 17} "No medical benefits payable under this chapter or Chapter 4121., 4127., or 4131. of the Revised Code are payable until the earlier of the following:

{¶ 18} "(1) The date of the issuance of the staff hearing officer's order under division (D) of this section;

{¶ 19} "(2) The date of the final administrative or judicial determination."

{¶ 20} Here, the bureau paid Ayala's medical benefits after the issuance of the staff hearing officer's order.

{¶ 21} Arth argues that the proper time for the payment of medical benefits is set forth in R.C. 126.30(D), which reads:

{¶ 22} "In applying this section to invoices submitted to the bureau of workers' compensation for equipment, materials, goods, supplies, or services provided to employees in connection with an employee's claim against the state insurance fund, * * * as compensation for injuries or occupational disease pursuant to Chapter 4123., 4127., or 4131. of the Revised Code, the required payment date shall be the date on which payment is due under the terms of a written agreement between the bureau and the provider. If a specific payment date is not established by a written agreement, the required payment date shall be thirty days after the bureau receives a proper invoice for the amount of the payment due or thirty days after the final adjudication allowing payment of an award to the employee, whichever is later. Nothing in this section shall supersede any faster timetable for payments to health care providers contained in sections 4121.44 and 4123.512 of the Revised Code.

{¶ 23} "* * *

{¶ 24} "For purposes of this division, 'final adjudication' means the later of the date of the decision or other action by the bureau, the industrial commission, or a court allowing payment of the award to the employee from which there is no further right to reconsideration or appeal that would require the bureau to withhold compensation and benefits, or the date on which the rights to reconsideration or appeal have expired without an application therefor having been filed or, if later, the date on which an application for reconsideration or appeal is withdrawn."

{¶ 25} Arth argues that the bureau should have waited until "final adjudication," i.e., the resolution of Arth's appeal, before paying the medical benefits.

{¶ 26} R.C. 4123.511(I) speaks for itself, unambiguously establishing the earliest date that the bureau may pay medical bills associated with a workplace injury. It states that medical benefits are payable at the earlier of the date of the issuance of the staff hearing officer's order or the date of the final administrative or judicial determination. The statute does not say that the bureau *must* pay medical benefits at "[t]he date of the issuance of the staff hearing officer's order," but that it may.

{¶ 27} In the face of such seemingly unequivocal language, what role does R.C. 126.30(D) play? The key is in R.C. 126.30(D)'s first line—"[i]n applying *this section* to invoices submitted to the bureau of workers' compensation." (Emphasis added.) The "section" referred to is R.C. 126.30, which requires state

agencies to pay interest charges for "any equipment, materials, goods, supplies, or services" when they fail to make payment by the required payment date. R.C. 126.30(A). R.C. 126.30(D) applies only to the Bureau of Workers' Compensation and sets the required payment date for purposes of calculating interest owed— the bureau must pay interest on payments made after that date.

{¶ 28} Thus, while R.C. 4123.511(I) allows medical benefits to be paid upon a staff hearing officer's order, medical bills would not be considered overdue and susceptible to the payment of interest until a final adjudication pursuant to R.C. 126.30(D). The statutes thus fit together and are not in conflict with each other. Since the question in this case concerns when the bureau may begin to make medical-benefit payments (as addressed in R.C. 4123.511[I]), and not whether the bureau should have paid any interest on late payments (as addressed in R.C. 126.30[D]), R.C. 4123.511(I) applies. Therefore, the timing of the bureau's payment of Ayala's medical benefits was permissible under the law, as the staff hearing officer's order was issued before March 11, 1998, and the bureau made its first payments to Ayala's medical providers nearly four months later.

## II

{¶ 29} The fact that the bureau *may* make medical-benefit payments under R.C. 4123.511(I) does not necessarily mean that those amounts may be charged immediately to an employer's risk account. The question becomes who should bear the short-term brunt of the bureau's decision to pay medical benefits prior to the final adjudication of the claim.

{¶ 30} The bureau points to R.C. 4123.34(A) as authority for immediately charging employer-risk accounts. R.C. 4123.34(A) provides that the administrator "shall keep an accurate account of the * * * money received from each individual employer and the amount of losses incurred against the state insurance fund on account of injuries, occupational disease, and death of the employees of the employer."

{¶ 31} The statute calls for recordkeeping but falls far short of mandating an immediate charge to an employer's risk account. Whether a claim on appeal even constitutes a "loss" under the statute, rather than a potential loss, is questionable.

{¶ 32} Although the appellate court below also rejected the idea that R.C. 4123.34(A) allows an immediate charge to an employer's risk account, it found authority for the practice in R.C. 4123.512(H). That statute reads:

{¶ 33} "If, in a final administrative or judicial action, it is determined that payments of compensation or benefits, or both, made to or on behalf of a claimant should not have been made, the amount thereof shall be charged to the surplus fund under division (B) of section 4123.34 of the Revised Code. In the event the

employer is a state risk, the amount shall not be charged to the employer's experience."

{¶ 34} The court below wrote that "R.C. 4123.511(H) is ambiguous with respect to when the bureau may charge an employer's risk account for benefit payments made on behalf of a state-fund insured employer's employee, as two reasonable and equally plausible meanings are conveyed by the language of the statute." The court of appeals set forth the two interpretations as follows:

{¶ 35} "On the one hand, the bureau argues that the provision provides that where a final administrative or judicial decision determines that benefit payments made by the bureau should not have been made, the amount of such payments[ ] shall be charged to the surplus fund, and where the employer is a state-fund insured employer, credited to the employer's risk account. On the other hand, Arth argues that the provision provides that where a final administrative or judicial decision determines that benefit payments made by the bureau should not have been made, the amount of such payments shall be charged to the surplus fund, and where the claimant's employer is a state-fund insured employer, the amount of such payments shall never be charged to the employer's risk account."

{¶ 36} The court wrote that "[i]n choosing between the two interpretations of R.C. 4123.512(H) offered by the parties, we are mindful of the principle that a court must defer to an agency's reasonable interpretation of a statute within its purview." The court found the bureau's interpretation of R.C. 4123.512(H) to be reasonable and thus found that the bureau acted lawfully when it charged the amounts paid for Ayala's medical payments to Arth's risk account while Arth's appeal was pending in the common pleas court.

{¶ 37} We disagree with the court of appeals. Although the bureau's policy of immediately charging an employer's risk account may seem reasonable as a way of doing business, or a reasonable accounting procedure, the policy does not result from a reasonable interpretation of R.C. 4123.512(H). The key statement in the statute—"[i]n the event the employer is a state risk, the amount shall not be charged to the employer's experience"—says nothing about crediting an employer's account. There is no contemplation in the statute that the employer's experience will have already been charged prior to the resolution of the appeal. The statute sets forth a flat prohibition—"shall not be charged." Earlier in the section, corrective measures are discussed: "[i]f * * * it is determined that payments of compensation or benefits * * * should not have been made, the amount thereof should be charged to the surplus fund." There is no parallel corrective device for charging an employer's experience. The statute does not say that "if an employer's experience has been charged, the employer's experience should be credited." The statute is not about fixing an error; it is about avoiding the error from the start. R.C. 4123.512(H) clearly requires that the

decision to impose a charge on experience must follow "a final administrative or judicial action." R.C. 4123.512(H) does not open the door to an immediate charge to an employer's risk account; to the contrary, it slams the door shut for such a charge until a final determination. Therefore, the bureau's immediate charge of Ayala's medical benefits to Arth's experience was contrary to law.

### III

{¶ 38} Finally, we address the extent to which the bureau must credit the account of an employer whose risk account has been improperly charged.

{¶ 39} The bureau's policy of crediting an employer's account upon a final determination in the employer's favor is usually noncontroversial. The parties here seem to agree that the bureau's crediting the amount of the Ayala medical payments to Arth's account resolves any issue arising from premium increases not related to Arth's group rating. The remaining issue is that of the premium increases imposed by COSE and whether Arth is entitled to a credit for the amount of the increases.

{¶ 40} The parties do not dispute that Arth paid higher premiums because of the change in group rating that occurred after the Ayala medical payments were charged to Arth's experience. However, the bureau argues that it was COSE's administrator, ICS, that actually made the change in group rating. Thus, the bureau argues, Arth has no recourse against the bureau. Arth contends that the bureau's refusal to credit the premium increases violates Arth's right to due process, and that state action existed because the bureau effectively required the increases.

{¶ 41} This court dealt with the public/private issue in the workers' compensation context in *State ex rel. AFL–CIO v. Ohio Bur. of Workers' Comp.*, 97 Ohio St.3d 504, 2002-Ohio-6717, 780 N.E.2d 981, ¶ 16–17:

{¶ 42} "The entanglement of private employers and the state in the administration of Ohio's workers' compensation system dates back to the system's creation and is rooted in the Ohio Constitution and statutory law. Section 35, Article II of the Ohio Constitution allows for the establishment of a workers' compensation system to be 'administered by the state.' Section 35, Article II states that the compensation awarded thereunder 'shall be in lieu of all other rights to compensation, or damages, for * * * death, injuries, or occupational disease, and any employer who pays the premium or compensation provided by law * * * shall not be liable to respond in damages at common law or by statute for such death, injuries or occupational disease.'

{¶ 43} "By statute, the state has made employer participation in the workers' compensation system mandatory, with limited exceptions. R.C. 4123.01(B)(2); R.C. 4123.35. Noncomplying employers are subject to suit brought by the state.

R.C. 4123.75. The administrative process for the adjudication of employees' claims is state-created. Section 35, Article II, Ohio Constitution; R.C. 4121.02 (creating the Industrial Commission); R.C. 4121.121 (creating the Bureau of Workers' Compensation)."

{¶ 44} In *AFL–CIO,* we addressed the constitutionality of enactments permitting private employers to perform drug tests on any employee claiming a workplace injury. While it was private employers that were performing the drug tests, we found state action because the legislation at issue made the results of those tests, or a refusal to take them, a basis for denying compensation for injuries. Id. at ¶ 18.

{¶ 45} Here, COSE's assignment of Arth into its Group B rating was a mix of state and private action. An administrative rule of the bureau mandated that COSE employ the bureau's actuarial information in assigning group status to Arth. Ohio Adm.Code 4123–17–64(A) states that "[t]he eligibility of data for use in the group shall be the same as the eligibility of data for use in the individual employer's rate calculation."

{¶ 46} Thus, the rule required COSE to rely on the actuarial data that the bureau provided. Since the bureau charged the amounts of Ayala's medical-bill payments to Arth's risk account, COSE was forced to rely on that information in determining Arth's eligibility for continued membership in Group A.

{¶ 47} Relying on that information, COSE assigned Arth to Group B, which meant that Arth would be forced to pay higher premiums for higher risk coverage. Moreover, Ohio Adm.Code 4123–17–62 prevents a group sponsor from retroactively correcting an error in group assignment. The rule states that "[t]he group may make no changes in the application [for group experience rating] after the last day for filing the application. Any changes received by the bureau after the filing deadline will not be honored." Ohio Adm.Code 4123–17–62(E).

{¶ 48} The bureau thus requires that mistakes corrected by the courts cannot be corrected within the group-rating system. An employer cannot be reassigned until the close of the year in which it was assigned its present status. Ohio Adm.Code 4123–17–62(A)(3). Moreover, the bureau itself has no mechanism to allow employers to recover amounts of increased premium payments made because of a shift in group assignment.

{¶ 49} Finally, the state was the recipient of the increased premiums paid by Arth.

{¶ 50} Thus, in this case, the bureau has acted contrary to statute by assigning medical payments to an employer's risk account prior to the final resolution of the case. The bureau required the employer's group sponsor to consider the employer's revised risk account prior to assigning it to a group. Arth alleges

that as a direct result of the actuarial information the bureau forced the employer's group to rely on, its group sponsor placed it in a group with higher premiums. Further, the bureau prevented Arth from amending its status until a year passed. Arth thus paid increased premiums, with no process available for reimbursement of the overpayments required to be paid by the acts of the bureau.

{¶ 51} As it stands, Arth has no way of recovering the increased premiums it paid to the bureau because of the bureau's reliance on illegally calculated and inaccurate data. The bureau has no system in place for the calculation of a refund.

{¶ 52} The bureau's policy thus fails on constitutional grounds, violating the right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution: "The right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution 'requires an opportunity [for remedial action] granted at a meaningful time and in a meaningful manner.'" (Bracketed material sic.) *State ex rel. Sysco Food Serv. of Cleveland, Inc. v. Indus. Comm.* (2000), 89 Ohio St.3d 612, 614, 734 N.E.2d 361, quoting *Burgess v. Eli Lilly & Co.* (1993), 66 Ohio St.3d 59, 62, 609 N.E.2d 140.

{¶ 53} Arth should have the opportunity to prove that the bureau's charging of the Ayala medical payments was the proximate cause of the increase in group premiums that Arth paid while those medical payments were charged toward its experience. The bureau should be liable to credit Arth only to the extent that the premiums it received exceeded those Arth would have made had the medical benefits not been charged to its risk account.

{¶ 54} We therefore reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

MOYER, C.J., LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

RESNICK and F.E. SWEENEY, JJ., dissent.

---

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 55} I originally voted to decline jurisdiction in this case and continue to adhere to that decision. The issues posed in this action touch the very core of the powers and functions of a state agency charged with administrating a social mechanism for distributing losses in the industrial arena. They involve the basic accounting methods and actuarial standards utilized by the Bureau of Workers' Compensation and its administrator to spread the risk of loss due to workplace

injury among classes of occupation while ensuring a solvent fund for the payment of compensation and benefits to injured and diseased workers and those who depend on them for support.

{¶ 56} We are dealing here with a premium-related administrative determination formulated by an agency that has accumulated considerable expertise in the area and to whom the General Assembly has delegated the responsibility of implementing and administering the legislative command for an equitable rating system. See, e.g., R.C. 4123.34(C). These are matters in which deference to the bureau's discretionary authority is paramount and judicial intervention is cautiously restricted to the most flagrant transgressions of administrative power. See *State ex rel. Ohio Aluminum Indus., Inc. v. Conrad,* 97 Ohio St.3d 38, 2002-Ohio-5307, 776 N.E.2d 63, at ¶ 20; *Swallow v. Indus. Comm.* (1988), 36 Ohio St.3d 55, 57, 521 N.E.2d 778. We are not experts in the field, and we have a duty to respect the legitimate policy choice made by the agency entrusted to make such a decision. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 865–866, 104 S.Ct. 2778, 81 L.Ed.2d 694. See, also, *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad* (2001), 92 Ohio St.3d 282, 287–288, 750 N.E.2d 130.

{¶ 57} The administrator has chosen to charge the employer's risk on the survey date for rate setting (July 1 of each year), rather than waiting until after the final adjudication of the claim, because he has determined that it is essential to the premium-rating system to treat the amount of medical benefits paid under R.C. 4123.511(I)(1) as an actual loss to the State Insurance Fund that occurs at the time the payment is made.[1] Yet there is no clearly discernible statutory or constitutional proscription against this methodology, and the court should be loath to fashion one out of the hodgepodge of overlapping arguments and oblique statutory provisions upon which Arth relies. Nor can such a prohibition be extrapolated from R.C. 4123.512(H), which provides:

{¶ 58} "If, in a final administrative or judicial action, it is determined that payments of compensation or benefits, or both, made to or on behalf of a claimant should not have been made, the amount thereof shall be charged to the surplus fund under division (B) of section 4123.34 of the Revised Code. In the event the employer is a state risk, the amount shall not be charged to the employer's experience. In the event the employer is a self-insuring employer, the self-insuring employer shall deduct the amount from the paid compensation the self-insuring employer reports to the administrator under division (L) of section 4123.35 of the Revised Code."

---

1. If it is finally determined that the claimant is not entitled to participate in the fund, or is not entitled to the benefits received or paid on his or her behalf, the administrator then credits the employer's risk account for the full amount that was previously charged to its experience.

{¶ 59} It is true that R.C. 4123.512(H) cannot be interpreted to authorize the bureau to charge the employer's risk account prior to a final determination and then credit the employer's account in the event the employer's appeal is successful. As pointed out by the majority, R.C. 4123.512(H) "says nothing about crediting an employer's account. * * * The statute does not say that 'if an employer's experience has been charged, the employer's experience should be credited.'" Thus, I do not agree with the court of appeals that the bureau has reasonably interpreted R.C. 4123.512(H) as providing authority for its actions in this case.

{¶ 60} However, I disagree with the majority that R.C. 4123.512(H) prohibits the bureau's methodology in this case. As the majority states, "[t]here is no contemplation in the statute that the employer's experience will have already been charged prior to the final resolution of the appeal." But this does not mean that the bureau is prohibited from charging the employer's risk before a final determination is made. There is nothing in R.C. 4123.512(H) to indicate that the General Assembly gave deliberate thought to this eventuality and then decided to preclude its occurrence.

{¶ 61} The problem with the majority's analysis is that it broadly interprets a postappeal provision in order to resolve a preappeal question. R.C. 4123.512(H) essentially provides for what happens after it is finally determined that payments of compensation or benefits made during the pendency of the employer's appeal should not have been made. It contains three remedial measures: (1) charging the amount to the surplus fund, (2) not charging the amount to the experience of a state-fund employer, and (3) deducting the amount from the self-insured employer's reporting form. The statute does not, however, purport to govern what happens in the time between the administrative order or event that triggered the payment of compensation or benefits and the final determination that reverses the award.

{¶ 62} Contrary to the majority's interpretation, R.C. 4123.512(H) does not clearly require that "the decision to impose a charge on experience must follow 'a final administrative or judicial action.'" That is not how the statute is worded. It does not say that "the amount shall not be charged to the employer's experience prior to a final administrative or judicial action." Nor does the statute specify that the bureau must wait until after a final determination of the claim to charge the employer's experience. It simply provides that "[i]f * * * it is [finally] determined that payments * * * should not have been made, * * * the amount shall not be charged to the employer's experience," which neither authorizes nor prohibits the imposition of a charge on the employer's experience prior to the final determination. It is only by way of reconstructing the syntax of

R.C. 4123.512(H) that the majority is able to interpret this provision to preclude the bureau's policy in this case.

{¶ 63} Since no provision in the workers' compensation scheme expressly prohibits a prefinality charge to the employer's risk account, and because the bureau has credited Arth's experience for the full amount that was previously charged to its risk in the Ayala claim, judicial intervention in the agency's accounting and actuarial practices is unwarranted in this case.

{¶ 64} I must, therefore, respectfully dissent.

F.E. SWEENEY, J., concurs in the foregoing dissenting opinion.

---

Willacy, LoPresti & Marcovy, Aubrey B. Willacy and Timothy A. Marcovy, for appellant.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, Stephen P. Carney, Senior Deputy Solicitor, Diane Richards Brey and William J. McDonald, Assistant Attorneys General, for appellee.