[Cite as *Cleveland v. Bur. of Workers' Comp.*, 2018-Ohio-846.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105604**

**CITY OF CLEVELAND, OHIO**

PLAINTIFF-APPELLEE

vs.

**OHIO BUREAU OF WORKERS'
COMPENSATION, ET AL.**

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-809883

**BEFORE:** E.A. Gallagher, A.J., S. Gallagher, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** March 8, 2018

**ATTORNEYS FOR APPELLANT**

Michael DeWine
Attorney General of Ohio
BY: James A. Barnes
Assistant Attorney General
150 East Gay Street, 22nd Floor
Columbus, Ohio 43215-3130

BY: Mark E. Mastrangelo
Jeffrey B. Duber
Assistant Attorneys General
615 West Superior Avenue, 11th Floor
Cleveland, Ohio 44113

David H. Wallace
Michael J. Zbiegien, Jr.
Taft Stettinius & Hollister L.L.P.
200 Public Square, Suite 3500
Cleveland, Ohio 44113

David J. Butler
James D. Abrams
Taft Stettinius & Hollister L.L.P.
65 East State Street, Suite 1000
Columbus, Ohio 43215

**ATTORNEYS FOR APPELLEE**

Maura L. Hughes
Mitchell G. Blair
Alexander Reich
Calfee, Halter & Griswold, L.L.P.
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607

Barbara A. Langhenry
Director of Law
BY: Lisa A. Mack
Assistant Director of Law
City of Cleveland Department of Law
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114

**AMICI CURIAE**

**Attorney for The Ohio Municipal League**

Garry E. Hunter
175 S. Third Street, Suite 510
Columbus, Ohio 43215

**Attorneys for Northeast Ohio Law Directors Association**

William R. Hanna
R. Todd Hunt
Walter Haverfield L.L.P.
1301 East 9th Street, Suite 3500
Cleveland, Ohio 44114

**Attorney for Ohio Mayors Alliance**

Chris W. Michael
Ice Miller L.L.P.
250 West Street, Suite 700
Columbus, Ohio 43215

EILEEN A. GALLAGHER, A.J.:

{¶1} Defendant-appellant, the Ohio Bureau of Workers' Compensation (the "BWC") appeals from a judgment of the Cuyahoga County Court of Common Pleas awarding plaintiff-appellee the city of Cleveland (the "city") over $4.5 million in restitution on the city's claim that it was unlawfully charged excessive workers' compensation insurance premiums in order to subsidize overly generous premium discounts given to public employers who participated in the BWC's group-rating program. The city's unjust enrichment claim was patterned after a similar claim raised by private employers in *San Allen v. Buehrer*, 2014-Ohio-2071, 11 N.E.3d 739 (8th Dist.).

**{¶2}** The BWC asserts that this case is "materially different" from *San Allen*. It contends that "threshold legal issues" regarding the court's subject matter jurisdiction, the city's alleged failure to exhaust administrative remedies and several other affirmative defenses "independently demand dismissal" of the city's lawsuit and that the equities in this case, unlike in *San Allen*, do not entitle the city to restitution. The BWC argues that the trial court erred in denying its motions to dismiss and for summary judgment and in granting, in part, the city's motion for summary judgment on the issue of liability. The BWC further contends that the trial court erred in precluding the BWC from raising its affirmative defenses at trial and that the trial court's restitution award is against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment.

## I. Factual Background and Procedural History

### A. The BWC's Rating System

#### 1. The State Insurance Fund

**{¶3}** The city, a municipal corporation, is a public employer taxing district ("PEC") governed by Ohio's workers' compensation laws. The administrator of the BWC, with the approval of its board of directors, sets the premiums employers pay into the state insurance fund for workers' compensation coverage each year. Pursuant to R.C. 4123.38, the city is required to "contribute to the public insurance fund the amount of money determined by the administrator of workers' compensation." The state insurance fund is comprised of two separate funds administered by the BWC, i.e., a "public fund" consisting of the net premiums (after adjustments and dividends) contributed by public employers, and a "private fund," consisting of the net premiums (after adjustments and dividends) contributed by private employers. R.C. 4123.01(B),

(H), (J); 4123.30.   R.C. 4123.30 requires that each fund be "collected, distributed, and its solvency maintained without regard to or reliance upon the other."

{¶4} The BWC is designed to operate on a "revenue-neutral" basis.   This means that the BWC seeks to collect from employers participating in Ohio's workers' compensation insurance program only the amount of premiums necessary to cover the BWC's projected claims costs and administrative expenses and to maintain a reasonable surplus in the state insurance fund.   Each year the BWC separately estimates for each employer segment, i.e., private employers and public employers, the costs of claims and expenses expected to be incurred for that segment.   Once the BWC determines the total premiums it needs to collect, the BWC then allocates that sum amongst the employers participating in the workers' compensation system.   Under Ohio's workers' compensation system, employers are classified into one or more manual classes based on the type of work in which their employees are engaged and the degree of hazard of the employer's operations.   After the BWC determines its total premium needs for the policy year for an employer segment, it distributes the premiums across the manual classes for that segment.

{¶5} There are approximately 3,800 PECs in Ohio.   PECs are assigned to one or more of 14 different manual classes based on the type of entity, e.g., city, county or township.   The policy year for PECs participating in Ohio's workers' compensation program begins on January 1 and ends on December 31 each calendar year.   A PEC can change the plan in which it participates from one policy year to the next.

## 2.   Base Rating and Experience Rating

{¶6} Employers are either base rated or experience rated under Ohio's workers' compensation system.   Base rated employers — employers that are too small to be rated on their own loss and payroll history — are charged workers' compensation premiums according to the

base rates of the manual class or classes to which they are assigned, i.e., based on the projected average costs of claims expected to be filed against all employers in the manual class for the policy year for which rates are being set. For a base-rated employer, no adjustment is made for the employer's actual historical loss experience.

{¶7} Employers that are not base rated are experience rated. Under experience rating, an employer's past claims experience, adjusted by a credibility factor based on the statistical reliability of the employer's experience, is used to determine the employer's premium.[1] With experience rating, an "experience modification factor" is applied that raises or lowers the premium from the base rate. Experience-rated employers are either credit-rated or debit-rated depending on their claims history. An employer whose loss experience is lower than average, compared with other employers in the same class, will receive a credit and pay a rate lower than the base rate. An employer whose loss experience is higher than average, compared with other employers in the same class, will receive a debit and may pay a premium higher than the base rate.

{¶8} The BWC determines base rates on an annual basis for each manual class by projecting the future costs of the combined loss experience of all employers in the manual class based on historical data and applying certain other factors, including a factor for catastrophic losses, a rate level factor (to reflect the overall statewide rate level), a factor to fund the operations of the division of safety and hygiene and an off-balance factor. The off-balance factor adjusts the base rate for the impact that experience rating (including group rating and the discounts given to group-rated employers under the group-rating program, discussed *infra*) has

---

[1]Credibility is essentially the weight given to an employer's experience.

on the overall expected collection of premiums.[2] Before comprehensive rate reforms were implemented in 2010, the off-balance factor varied from manual class to manual class for PEC employers.

{¶9} Annual assessments are added to the base rate or the experience-modified base rate, as applicable, to cover administrative costs of the BWC and Industrial Commission and to fund certain relief funds for disabled workers (the "assessments"). The assessments are calculated as a percentage of premium.

{¶10} A base-rated employer's "pure premium" is calculated by multiplying the employer's payroll in each manual class by the base rate for each manual class. An experience-rated employer's "pure premium" is calculated by multiplying the employer's payroll in each manual class by the experience-modified rate for each manual class. The employer's "blended premium" is calculated by adding the assessments and subtracting any discounts earned by the employer for participating in the BWC's discount programs. The total of the premiums assessed for each manual class to which the employer is assigned, plus assessments, less any rebates or discounts the employer receives based on its participation in various programs offered by the BWC, is the employer's total workers' compensation premium.

### 3. Retrospective Rating

---

[2]As the court previously explained in *San Allen*:

> The off-balance factor is used to offset a premium shortfall or overage condition in the overall level of premiums collected from employers due to experience rating (including both individual experience rating and group rating) and discounts or rebates given to employers participating in the BWC's discount programs. Even if there had been no group rating, use of an off-balance factor would still be necessary to account for discounts given as a result of individual experience rating and the BWC's other discount programs.

*San Allen*, 2014-Ohio-2071, 11 N.E.3d 739, at ¶ 18, fn. 5.

{¶11}   During the time period at issue, the BWC offered a retrospective-rating plan for individual employers.   A "step closer to self insurance," retrospective rating allows employers to assume more of the risk themselves in exchange for lower upfront premiums.   A retrospectively rated employer pays a reduced portion of the premium it would have otherwise paid had it chosen not to participate in the retrospective-rating plan.   In exchange, the employer assumes financial responsibility for the actual paid claim costs incurred for the next ten years,[3] up to individual and overall claim limits that the employer selects.   Premiums are determined on an annual basis.   A retrospectively rated employer pays an annual "minimum pure premium" equal to the employer's experience-modified pure premium multiplied by a "minimum premium percentage" determined by the claim limits selected by the employer, e.g., payroll times base rate times experience modifier times minimum premium percentage.   The minimum premium percentage is based on the BWC's estimates of the cost of insurance risks transferred to the BWC (i.e., the risk associated with the claim limits selected by the employer) and other administrative expenses and charges; a lower percentage is applied for employers that assume a greater share of the risk and a higher percentage is applied for employers who assume less risk.   The minimum premium percentages are periodically adjusted by the BWC.   The annual assessments paid by an employer are the same regardless of whether the employer participates in experience rating or retrospective rating.   An employer's "minimum retrospective blended premium" is equal to the minimum retrospective pure premium plus the assessments.

### 4.   The BWC's Group-rating Program

---

[3]A retrospectively rated employer pays annual billings of the actual paid claims costs (i.e., the medical and indemnity payments the BWC makes on its employees' claims) in years one through nine.   In the tenth year, the employer pays the actual paid claims costs for that year plus the value of any remaining reserves on yet unsettled claims.

**{¶12}** In 1989, the General Assembly amended R.C. Chapter 4123 to require the BWC to develop and implement a plan "that groups for rating purposes, employers, and pools the risk of the employers within the group."   Am.Sub.H.B. No. 222.

**{¶13}** In response to this mandate, the BWC began offering group-rating plans to employers.   The BWC established a group-rating plan for private employers in the policy year beginning July 1, 1991 and for public employers in the policy year beginning January 1, 1992.  *See* Ohio Adm.Code 4123-17-61-4123-17-68.   Initially, the BWC implemented only a prospective group-rating plan.   The BWC did not offer a retrospective group-rating plan until 2009 for private employers and 2010 for public employers.

**{¶14}**   Before group rating, employers could qualify for experience rating only on an individual basis.   Group experience rating allowed employers to group together their claims history and receive experience-related premium discounts similar to larger employers.   Group rating thus enabled employers with good safety records, but who were statistically too small to be individually experience rated and who would otherwise be base rated or experience rated with minimal credibility, to group together with other employers to qualify for experience rating.   By combining the experience of all of the members of the group, totaling it up, and treating the group as a single employer for rating purposes, the group could qualify for premium discounts based on their combined claims experience.   These discounts were, at times, quite significant.

**{¶15}** Because the BWC operates on a revenue-neutral basis, the loss in premiums resulting from the discounts provided to employers under the BWC's group-rating program had to be redistributed.   In other words, the premium obligations for nongroup-rated employers needed to be increased in order to offset the substantial discounts provided to employers participating in the group-rating program.   As Christopher Carlson, the BWC's chief actuarial

officer and Elizabeth Bravender, the BWC's director of actuarial operations, explained, this was achieved by increasing the off-balance factor used in calculating the base rates for the manual classes. In short, the BWC determines a target amount of total premiums to be collected for each manual class, calculates how much experience rating (including group rating) moves the total away from the target and then uses the off-balance factor to return the total premiums to be collected back to the target.

{¶16} Increasing the off-balance factor increased the base rate for all employers. Therefore, employers who were not part of a group (and did not receive the significant discounts off base rates that group members received), in effect, paid "extra premiums" to make up for the discounts granted to group-rated employers under the BWC's group-rating program.

### 5. Problems with the BWC's Group-Rating Program

{¶17} The group rating program was flawed from the start. Bravender testified that even before the BWC's prospective group rating program went into effect concerns were raised by the BWC's actuarial consultants regarding the program's susceptibility to manipulation by group sponsors and the potential for premium inequity between group-rated and nongroup-rated employers as a result of the generous premium discounts provided to group-rated employers under the program.

{¶18} Equity concerns continued to be raised once the group rating program was underway. From 1990 through 2009, the BWC commissioned ten independent actuarial studies to evaluate the BWC's group rating plans. Each of these studies concluded that, as a result of the large discounts given to group-rated employers, the BWC's group rating program was creating substantial premium inequity between group-rated and nongroup-rated employers, i.e., group-rated employers were not paying enough premiums to cover the risk they presented, and

nongroup-rated employers were paying too much in premiums, subsidizing the discounts given to the group-rated employers. Each of these studies also recommended that changes be made to the group rating program to correct this inequity.

{¶19} According to Bravender, the early studies commissioned by the BWC focused on the effect of group rating on private employers and did not specifically address whether premium inequity existed between group-rated and nongroup-rated PECs.[4] In 2004, the BWC's actuarial section in conjunction with actuarial consultant Mercer Oliver Wyman conducted an analysis of the group rating program with respect to both private employers and PECs. According to an August 2004 report, "[t]he results of the study indicate that the merit rating methodology allows for too great of credits to employers and that the non-group rated employers are subsidizing the group rated employers[.]" The report stated that "[t]he off-balance factor that results from the introduction of the group rating program indicates that the base rates have had to be increased * * * over the normal rate increases in order to obtain the desired level of overall premiums given the large credits that were calculated for the groups." The report further indicated that the total nongroup PEC employer "premium subsidy" for rating years 1992-2001 (the time period referenced in the report) was $69,722,959.

{¶20} A 2006 study by Pinnacle Actuarial Resources, Inc. ("Pinnacle") and a 2009 study by Deloitte Consulting L.L.P. ("Deloitte") also specifically analyzed the equity of the group rating program as applied to PECs. In a December 2006 report, Pinnacle concluded that the credits that were being issued to both private and public group-rated employers exceeded the credits they should have received based on their losses: "Similar to the private employers, the

---

[4] Only certain of these studies are part of the appellate record. Accordingly, we are unable to confirm whether all of the early studies were limited to an analysis of the group rating program as applied to private employers.

public employer – taxing district experience shows that the group rated policies with the lower experience modification factors have better manual loss ratios than the other insured but the impact of the experience rating plan is generally too generous resulting in a situation where the losses are double the premium collected to cover them." Carlson, who authored the Pinnacle report,[5] testified that the problems with the group-rating program as applied to PECs were not as "widespread" or "as large in magnitude" as they were with private employers, but that each of the conclusions reached in the report "would apply to publics as they did to privates," including that the size of the credits being given to PECs who participated in group rating were larger than would have been indicated by their loss experience.

{¶21} Bravender offered similar testimony. She acknowledged that the problem of nongroup-rated employers subsidizing excessive discounts to group-rated employers existed both with respect to private employers and PECs, but that the problem was "less severe" on the PEC side. John Pedrick, the BWC's chief actuarial officer from July 2007 until June 2011, testified that, during the time period at issue, nongroup-rated PECs were subsidizing over-sized discounts given to group-rated public employers through an increased off-balance factor.

{¶22} In its 2009 report, Deloitte concluded that "[t]he current pricing structure" under the BWC's rating system "has created substantial inequity in the premiums paid by different employers," that the "primary driver of this inequity is the [BWC's] current approach to group rating" and that the "performance results of the group rating program indicate a substantial lack of actuarial soundness with respect to equitable rating." Deloitte concluded, with respect to the premiums paid by private employers, that "[t]he results of this analysis indicate a material

---

[5]At the time, Carlson was employed by Pinnacle and was the lead project actuary for the 2006 study of the BWC's group-rating program.

inequity from group rating and therefore group rated employers on an overall basis receive substantially more premium credit than is merited by their experience." With respect to premiums paid by PECs, Deloitte indicated: "In general, similar conclusions reached for [private employers] hold for PEC policies. However, the results are not as strong as there is a significantly lower policy count in PEC. * * * [I]nequity similar to [private employer] policies is indicated due to the use of the charged [experience-modification rating] for group rated policies."

{¶23} Bravender and Pedrick expressly acknowledged the "inequities" of the BWC's group-rating program as related to PECs — albeit to a lesser extent than private employers — and testified that rate reforms initiated for PECs in 2010 remedied those inequities by lowering the off-balance factor and standardizing it across the board.

## B. The City's Participation in the Workers' Compensation System

{¶24} During the time period at issue, the city's employees fell within two manual classes — 9431 ("cities") and 9439 ("public employer emergency service organization"). Most of its employees were in the 9431 class. Eduardo Romero, the city's risk manager, testified that the city evaluated its workers' compensation insurance options and each year selected a plan that it believed represented the best value for the city. Through the 2002 policy year, the city was experience-rated. Beginning in 2003, the city switched to an individual retrospective-rating plan. Romero testified that the city decided to switch to a retrospective-rating plan because experience rating was a "Cadillac policy for [w]orkers' [c]ompensation," the city felt it could have greater autonomy over claims management by shifting to a retrospective-rating plan and the retrospective-rating plan provided cash flow advantages by reducing the city's "upfront obligation." The city was never group rated under the BWC's group-rating program.

**{¶25}** Through 2002, when the city was experience rated, it paid a pure experience-rated premium to the BWC. Beginning in 2003, when it was retrospectively rated, the city paid a minimum premium, i.e., an agreed percentage of what would have otherwise been its pure experience-rated premium, plus assessments and separately paid actual losses incurred for employee claims up to the agreed limits.

## C. Rate Reforms

### 1. The BWC's 2010 Group-Rating Rate Reforms

**{¶26}** With the policy year beginning July 1, 2009, the BWC began making significant changes to its rating system to set more equitable premium rates for group-rated and nongroup-rated private employers.

**{¶27}** A key element of the BWC's reforms involved the calculation of the off-balance factor. As then-BWC administrator Marsha Ryan explained when testifying before the Ohio Senate Insurance Commerce and Labor Committee in October 2009:

> The signature achievement of this plan is that the connection between discounts for group-rated employers and base rates for non-group rated employers has been severed. This means that non-group employers' premiums are not inflated to cover premium shortages caused by the group-experience rating program. By setting the base rates for all employers independent of the pricing actions in group experience rating, BWC eliminated any chance of non-group employers bearing additional costs created by group-rated employers * * * .

**{¶28}** Instead of calculating separate off-balance factors for each manual class as it had in the past, the BWC applied a uniform off-balance factor in setting rates for all manual classes. The BWC made other changes to its rating program as well, including reducing the maximum

credibility to 77 percent and applying a group "break-even factor," which had the effect of decreasing the premium discounts received by group-rated employers.

{¶29} These changes took effect beginning in 2010 for PECs (the "2010 rate reforms"). During an August 2009 BWC actuarial committee meeting, Pedrick explained that "[t]he goal" of the rate reforms as applied to PECs was "to achieve rate equity by setting the rate structure to reach the relative rate levels of 1.10 for non-group and 0.70 for group and eliminate the impact of group discounts on base rates by establishing a uniform off-balance factor for all PEC manual classes at 1.01." In 2010, the uniform off-balance factor for PECs was set at 1.01; however, it was subject to change each year.[6]

### 2. 2016 Changes to the BWC's Retrospective-Rating Plans

{¶30} Unrelated to the group-rating program, in January 2016, the BWC also made certain changes to its retrospective-rating plans, including increasing the minimum premium factors and adopting a loss conversion factor, a multiplier, to be applied to retrospective payments. In 2012, the BWC retained Deloitte to analyze its individual retrospective-rating plans, including the minimum premium percentages. In a September 2013 report, Deloitte recommended an "overall minimum premium increase" of 29% for private employers and 23.5% for PECs participating in the BWC's individual retrospective-rating plans due to "the apparent lack of provisions for certain costs in the current minimum premium percentages." According to the Deloitte report, "there was no information or rationale as to why the current minimum percentages do not appear to have appropriate loadings for these costs."

---

[6] The city admitted that the rate reforms the BWC implemented for PECs beginning in year 2010 resolved the premium equity problems with the group-rating program and that the city has not experienced any premium overcharges relating to group rating since 2009.

**{¶31}** Carlson indicated that the BWC revised its retrospective-rating factors "on a periodic basis," "hopefully, every five years," but that the minimum premium factors had been last studied in 2006. Carlson testified that the Deloitte report revealed that the BWC "didn't effectively design" its retrospective-rating plans and had been undercharging employers who participated in its individual retrospective-rating plans for the risk they transferred to the BWC. He indicated that the "major reason" for this was because the BWC had failed to include the cost of its health partnership program in either the minimum premiums or the collections on individual paid losses. He stated that the BWC had also failed to include a provision for loss development past 120 months, i.e., to reflect the fact that, after the end of the ten-year period when the BWC collects reserves from the employer, the reserves would continue to escalate.

## C. The Litigation

### 1. The City's Complaint Against the BWC

**{¶32}** On June 28, 2013, the city filed suit against the BWC. The city amended its complaint in December 2013. Asserting "a claim in equity for unjust enrichment" against the BWC, the city alleged that "[f]or many years," the BWC had charged the city and other nongroup-rated PECs "excessive and inequitable workers' compensation premiums" to fund overly generous discounts given to group-rated PECs under its group-rating plan, knowingly undercharging group-rated PECs and knowingly overcharging nongroup-rated PECs for their respective risk. The city claimed the BWC's group-rating plan violated former R.C. 4123.29, 4123.34 and 4123.39 and that the BWC had been unjustly enriched by its wrongful collection and retention of excessive premiums from the city. The city sought (1) a declaration that the BWC's group-rating plan violated R.C. 4123.29. 4123.34 and 4123.39, (2) an order requiring the BWC to disgorge and repay the excessive premiums that had been wrongfully collected and

retained by the BWC, (3) an award of its "return on investment in connection with the excess premiums" along with pre-judgment and post-judgment interest, costs and attorney fees and (4) "such other and further relief as [the] Court may deem just."

### 2. The BWC's Motion to Dismiss

{¶33} In February 2014, the BWC filed a motion to dismiss the city's amended complaint. The BWC argued that the common pleas court lacked subject matter jurisdiction over the city's lawsuit because, despite its characterization of its claim as equitable, the city was actually seeking "the legal remedy of money damages" which "falls within the exclusive jurisdiction of the Court of Claims." The BWC also argued that former R.C. 4123.29 and 4123.34(C) did not apply to the premiums charged the city because they were not among "the specific statutes governing the BWC's rate-making for contributions made by public employers" and that the only statutory provision governing rate-making for public employers that the city alleged had been violated — R.C. 4123.39 — did not apply because the city did not challenge the BWC's manual classification of public employers. The BWC further argued that the city's unjust enrichment claim was barred, in whole or in part, by the applicable statute of limitations and because the city had failed to exhaust its administrative remedies under R.C. 4123.291. The city opposed the motion.

### 3. The *San Allen* Decision

{¶34} While the BWC's motion to dismiss was pending, this court issued its decision in *San Allen*, 2014-Ohio-2071, 11 N.E.3d 739. In *San Allen*, a class of private, nongroup-rated employers sued the BWC to recover excessive premiums they had been charged to subsidize discounts given to group-rated employers under the BWC's group-rating program from 2001-2008. The class included employers who had been nongroup rated during any of the years

at issue and, therefore, included employers who had been group rated in certain years and nongroup rated in others. *Id.* at ¶ 25.

{¶35} The trial court held that the BWC had been unjustly enriched as a result of its unlawful collection of excessive workers' compensation premiums from nongroup-rated employers and that the plaintiffs were entitled to restitution of the amounts by which they had been overcharged as a result of the BWC's violation of former R.C. 4123.29 and 4123.34(C). *Id.* at ¶ 47. Following a hearing on the final restitution amount, the trial court awarded plaintiffs $859,440,258.79 in restitution on their unjust enrichment claim. *Id.* at ¶ 49. This court affirmed the trial court's findings that the BWC's prospective group-rating plan violated former R.C. 4123.29 and that the BWC had knowingly maintained an inequitable rating system, resulting in excessive premiums payments by nongroup-rated private employers, in violation of R.C. 4123.34(C). *Id.* at ¶ 78-82, 112. However, it reversed and remanded the case for recalculation of the portion of the restitution award relating to class members who were group rated during part of the class period, to include an offset for the subsidy benefits those class members received under the group-rating plan during the years within the class period in which they were group rated. *Id.* at ¶ 137.

### 4. The Trial Court's Ruling on the BWC's Motion to Dismiss

{¶36} In June 2014, the trial court denied the BWC's motion to dismiss, concluding that it had subject matter jurisdiction over the dispute, that the city was not required to exhaust any administrative remedies provided for in R.C. 4123.291 before filing suit and that the city "had succeeded in alleging legal causes of action." The trial court pointed out that in *San Allen* this court had previously determined that former R.C. 4123.29(A)(4)(c) "contained a mandate that the BWC use a retrospective group rating system" — not a prospective group-rating system — and

that the BWC violated R.C. 4123.34 "by overcharging non-group participants relative to the risks they posed." The trial court rejected the BWC's arguments that R.C. 4123.29 and R.C. 4123.34(C) applied only to private employers and held that if, as the city alleged, the BWC had "overcharged [the city] as a non-group participant relative to the risk it imposed," that would constitute a violation of R.C. 4123.34(C). The trial court also held that the city had "properly alleged a violation of R.C. 4123.39" and rejected the BWC's arguments that the city's unjust enrichment claim was time-barred.

{¶37} On June 26, 2014, the BWC filed its answer. The BWC denied the material allegations of the city's amended complaint and asserted twenty-three "defenses."[7]

### 5. Cross-Motions for Summary Judgment

{¶38} In September 2016, the city and the BWC filed cross-motions for summary judgment. The BWC argued that it was entitled to summary judgment because (1) the city's unjust enrichment claim was barred by the voluntary payment doctrine; (2) the city's unjust enrichment claim was time-barred, in whole or in part, by the two-year limitations period set forth in Ohio Adm.Code 4123-17-17, the five-year limitations period set forth in R.C. 126.301 or the six-year limitations period set forth in R.C. 2305.07; (3) the city's unjust enrichment claim was barred by laches and (4) the premiums paid by the city "were not excessive considering the totality of the circumstances."[8]

---

[7]The BWC's "defenses" included failure to state a claim for which relief could be granted, lack of jurisdiction, improper venue, failure to join a necessary party, failure to exhaust administrative remedies, failure to mitigate damages, lack of standing, waiver, estoppel, release, laches, setoff and recoupment, payment, accord and satisfaction, "applicable immunities" and the statute of limitations. The BWC also contended that the city's amended complaint was barred in whole or in part because: the city is a public employer who is "subject to specific rate-making statutes," the amended complaint "seeks the determination of discrete facts," the city was retrospectively rated, the BWC did not charge the city excessive premiums, the city's claim for repayment was not liquidated, the statutes at issue do not invoke a private right of action and equity favors the BWC.

[8] In support of its motion for summary judgment, the BWC attached excerpts from the depositions of Romero,

**{¶39}** The city argued that the BWC was collaterally estopped from challenging "key factual and legal findings" relevant to its claim based on this court's decision in *San Allen, supra.* The city argued that it was entitled to summary judgment because there were "no material issues of disputed fact" that the BWC's rating system as applied to the city violated former R.C. 4123.29(A)(4)(c), 4123.34(C) and 4123.39, that the city had been overcharged premiums under the same group-rating program found to be illegal in *San Allen* and that the BWC had been unjustly enriched by the "millions of dollars" it had overcharged the city "to cover excessive discounts granted to group-rated PECs." The city also asserted that, based on the undisputed facts, it was entitled to restitution of $4,524,392 in premium overcharges.[9]

### 6. The Parties' Actuarial Experts

### a. The City's Expert

**{¶40}** The city retained actuarial consultant Allan Schwartz ("Schwartz"), who was also the plaintiffs' expert in *San Allen*, to support its unjust enrichment claim. Schwartz opined that the city had been overcharged for its workers' compensation premiums under the BWC's rating system based on (1) actuarial reports that concluded that nongroup-rated employers as a whole

---

Carlson, Pedrick, the city's expert, Allan Schwarz, the BWC's expert, Gary Josephson, and an affidavit from Ronald Suttles, the BWC's director of employer programs and business analysis, in which he explained the claims costs paid by retrospectively rated employers.

[9] In support of its motion for summary judgment, the city attached excerpts of the depositions of Bravender and Carlson taken in this case, excerpts of the depositions of Bravender and Pedrick taken in *Parma v. Ohio Bur. of Workers' Comp.*, Cuyahoga C.P. No. CV-13-814017 (the "*Parma* case"), the trial court's decision in *San Allen*, the trial court's journal entry denying the BWC's motion for summary judgment in the *Parma* case, excerpts from the BWC's "Plan for Adequacy and Equity in Ohio's Group-Experience-Rating Program" (Oct. 26, 2009), reports relating to studies conducted by the BWC's independent actuaries of the BWC's group-rating program in 1993, 1994, 2004, 2006 and 2009, BWC Administrator Marsha Ryan's testimony before the Senate Insurance Commerce and Labor Committee regarding group rating and comprehensive review (Oct. 20, 2009), a report on group and nongroup rate levels presented to the actuarial committee of the BWC's Board of Directors (Feb. 19, 2009), minutes from a August 27, 2009 meeting of the actuarial committee of the BWC's Board of Directors, a Powerpoint presentation entitled, "Rate Reform for Public Employer-Taxing Districts," an affidavit from Carlson (from the *Parma* case), an affidavit from Romero regarding the city's participation in the workers' compensation system and a declaration from Schwartz setting forth his opinions, analysis and calculations.

had been overcharged as a result of the BWC's group-rating program and (2) testimony by BWC representatives, including Bravener, Pedrick and Carlson, that excessive discounts and subsidies had been given to group-rated PEC employers funded by nongroup-rated PEC employers. He further opined that the amounts the BWC charged the city were "legally inequitable" and, therefore, "actuarially inequitable," based on the BWC's use of an illegal and inequitable group-rating program as found in *San Allen.*

**{¶41}** Schwartz claimed that from 1997 to 2009, the BWC overcharged the city $4,524,392 for its workers' compensation premiums by using an inflated off-balance factor. For each of the years at issue, Schwartz calculated a rate adjustment factor by comparing the off-balance factor the BWC had actually used when calculating the city's premiums to a "corrected" off-balance factor of 1.01 — the uniform off-balance factor the BWC applied to all PEC manual classes beginning in policy year 2010 when attempting to eliminate the impact of group discounts on the base rate. [10] He then subtracted the rate adjustment factor (as a percentage) from 100 to determine the percentage overcharge. He multiplied the premiums paid by the city (less the amount of any rebates or dividends received) by the percentage overcharge to determine the dollar value of the premium overcharges for each of the years at issue. For the years in which the city participated in retrospective rating, the amount of the "retro billings," i.e., the actual claims costs, was not included in the premium overcharge calculations because it was not impacted by the base rate and, therefore, was not affected by the inflated off-balance factor.

---

[10]Although the city paid premiums in two manual classes during the time period at issue — 9431 and 9439 — "for ease of calculation," Schwartz used only the actual off-balance factor for class 9431 in calculating the amount of premium overcharges because, according to Schwartz, it had "99.9 percent of the premium in it, or maybe even more than that." Schwartz explained that, had he done the calculation for each class separately, the amount of the overcharge would have been "slightly higher," because class 9439 had a higher actual off-balance factor. Because the actual off-balance factor was not available for 1997, Schwartz estimated the actual off-balance factor for that year as the average of the actual off-balance factors for the next three years.

However, administrative assessments, which were set as a percentage of premium, were included in the calculation of the premium overcharges for the years for which data was available.[11] Based on Schwartz's calculations, the annual percentage overcharges during the period 1997 to 2009 ranged from 0.15% in 2009 to 12.22% in 2003. Schwartz testified that his methodology represented a "reasonable," "actuarially sound basis" for determining the amount by which the BWC overcharged the city.

### b. The BWC's Expert

{¶42} The BWC retained actuarial consultant Gary Josephson to (1) evaluate Schwartz's opinions and calculations and (2) determine the impact of group rating on the premiums the city would have paid had the changes to the group-rating program that were implemented in 2010 been in place during the policy years at issue. Josephson claimed that because the off-balance factor is used to offset the aggregate impact of experience rating and because experience rating values change from year to year, Schwartz's use of a single off-balance factor of 1.01 for all years was "actuarially inappropriate." Josephson also criticized Schwartz's failure to take into account the implementation of a group break-even factor and reduction of maximum credibility. He claimed that these factors should be considered in calculating the impact of the rate reforms because a change in credibility or a decrease in the discounts given to group-rated employers could change the experience rating calculations which, in turn, could affect the off-balance factor.

{¶43} Josephson offered an "alternative calculation." Under his alternative calculation, Josephson estimated that the city would have paid approximately $2.7 million in lower premiums

---

[11]This data was available for 2003 to 2009. The alleged premium overcharges related to assessments constituted approximately $814,000 of the $4,524,392 total premium overcharges calculated by Schwartz.

had the 2010 rate reforms been in effect from 1997 to 2009. The primary difference between his calculation and Schwartz's calculation involved the off-balance factor used in the calculation. Whereas Schwartz used 1.01 — the uniform off-balance factor adopted by the BWC in 2010 — in calculating premium overcharges for all years, Josephson recalculated a new, alternative uniform off-balance factor for each year. Josephson also incorporated the breakeven factor and credibility limits added in 2010 in his calculation. Josephson testified that he took the BWC's premium, payroll and loss data, replaced the credibility factors that had been used, applied the credibility limit implemented in 2010, added in the group break-even factor, recalculated the groups' experience rating factor and then recalculated "what the off-balance was as a result of that."

{¶44} Josephson claimed that Schwartz's analysis did not support the conclusion that the city had been "overcharged" for its workers' compensation premiums. Josephson opined that the $2.7 million premium impact he calculated, i.e., a 2.2% reduction in premiums from the approximately $120 million in premiums the city actually paid, was "well within the range of normal variability that exists in the ratemaking process" and that, therefore, "group rating did not materially impact Cleveland's premiums." He further opined that the BWC should not be required to return any premium payments to the city because it is "not practical" to go back and repay or recollect premiums for changes that are made in the rating process. He indicated that just "[b]ecause the methodology is changed or different assumptions are used does not mean the insuring entity should adjust historical premiums paid by policyholders" and that "[i]nsuring entities typically do not adjust prior years' premiums for changes in the ratemaking methodology."

**{¶45}** Josephson also disputed the suggestion that the city had been "overcharged" for its workers' compensation premiums because the city had been charged less than it should have been charged for its minimum premiums during the years in which it was retrospectively rated. Josephson testified that had the 2016 changes to the minimum premiums been in effect in 2003-2009, the difference in the city's minimum premiums would have likely been greater than the impact of the 2010 rate reforms for that time period.

### 7. The Trial Court's Ruling on Summary Judgment

**{¶46}** On December 22, 2016, the trial court granted the city's motion for summary judgment in part and denied it in part. It granted the city's motion as to liability on its unjust enrichment claim concluding that, after the city met its initial burden under Civ.R. 56, the BWC "failed to raise genuine issues of material fact with evidence satisfying the requirements of Civ. R. 56(E) on the issue of liability, as was its burden." However, the trial court determined that there were "questions of material fact * * * as to the amount of restitution owed to Plaintiff." It held that the case would proceed to a bench trial "to determine the amount of restitution due to Plaintiff." The trial court denied the BWC's motion for summary judgment.

### 8. Trial on Restitution

**{¶47}** In January 2017, the trial court held a bench trial on the amount of restitution due the city. The city presented testimony from Bravender, Carlson, Pedrick and Schwartz[12] and argued that it should be awarded $4,524,392 in restitution for the premium overcharges it paid to

---

[12]Bravender, Carlson, Schwartz and Josephson testified live at trial. The city also designated deposition testimony from Bravender, Carlson and Pedrick. The parties entered into a number of pretrial stipulations, including stipulations as to the net premiums paid by the city (premiums paid less rebates received) from 1997-2009, the assessments paid by the city from 2003-2009, the off-balance factors applied by the BWC for the two manual classes at issue during the years 1998-2009 and the uniform off-balance factors applied by the BWC during the years 2010-2015, and also stipulated that each of the parties' experts was qualified as an expert to testify regarding the actuarial issues in the case.

fund discounts given to group-rated PECs under the BWC's group-rating program. The BWC argued, based primarily on testimony from Josephson, that the city was not entitled to any restitution on its unjust enrichment claim because there was no credible evidence that the city had been "impacted to [its] detriment" by group rating. The BWC contended that Schwartz's methodology and calculations were deficient and unreliable, that Josephson's methodology and calculations were credible and reliable and that the equities favored the BWC because the minimum premiums the city paid during the years it was retrospectively rated were insufficient to cover the risk it transferred to the BWC.

{¶48} At the conclusion of the city's case-in-chief, the BWC moved to dismiss the case pursuant to Civ.R. 41(B)(2). The BWC argued that the city had failed to prove that it was entitled to restitution because Schwartz's methodology was not actuarially reliable. The trial court denied the motion. At the conclusion of the BWC's case, the BWC renewed its motion to dismiss arguing that, considering the weight of the testimony of both experts, the relief sought by the city was not supported by the evidence in the record. Once again, the court denied the motion.

{¶49} On February 27, 2016, the trial court issued its decision, awarding the city $4,524,392 in restitution plus post-judgment interest at the statutory rate.

{¶50} The BWC appealed, raising the following five assignments of error for review:

Assignment of Error No. I: The trial court erred in denying the motion of Defendant-Appellant Ohio Bureau of Workers' Compensation (the "Bureau") to dismiss the First Amended Complaint of Plaintiff-Appellee City of Cleveland ("Plaintiff" or Cleveland").

Assignment of Error No. II: The trial court erred in denying the Bureau's motion for summary judgment and in granting in part Cleveland's motion for summary judgment.

Assignment of Error No. III: The trial court erred in granting Cleveland's motion in limine regarding the Bureau's affirmative defenses.

Assignment of Error No. IV: The trial court erred in denying the Bureau's motion to dismiss during the trial.

Assignment of Error No. V: The trial court erred in awarding Cleveland more than $4.5 million.

## II. Law and Analysis

**{¶51}** In its first assignment of error, the BWC contends that the trial court erred in failing to dismiss the city's complaint for lack of subject matter jurisdiction and failure to exhaust administrative remedies. We disagree.

### A. Motion to Dismiss

#### 1. Subject Matter Jurisdiction

**{¶52}** "'Subject-matter jurisdiction is the power conferred on a court to decide a particular matter on its merits and render an enforceable judgment over the action.'" *ABN AMRO Mtge. Group, Inc. v. Evans*, 8th Dist. Cuyahoga No. 96120, 2011-Ohio-5654, ¶ 5, quoting *Udelson v. Udelson*, 8th Dist. Cuyahoga No. 92717, 2009-Ohio-6462. When evaluating subject matter jurisdiction, we apply a de novo standard of review. *Id.*

**{¶53}** The BWC contends that the city's claim for restitution is actually a claim for money damages, i.e., a legal remedy over which the court of claims has exclusive jurisdiction. As such, the BWC argues, the trial court erred as a matter of law in determining that it had subject matter jurisdiction over the case.

**{¶54}** The city's claim in this case is the same claim raised by the plaintiffs in *San Allen*, i.e., a claim for unjust enrichment seeking equitable restitution of the amount of workers' compensation insurance premiums collected by the BWC in excess of the premiums the city

should have been charged. Accordingly, for the same reasons this court concluded that the common pleas court had subject matter jurisdiction over the plaintiffs' claims in *San Allen*, *see San Allen,* 2014-Ohio-2071, 11 N.E.3d 739, ¶ 53-61, we find that the common pleas court had subject matter jurisdiction over the city's claim here. Accordingly, the trial court did not err in refusing to dismiss the city's amended complaint for lack of subject matter jurisdiction.

### 2. Exhaustion of Administrative Remedies

**{¶55}** The BWC also contends that the trial court erred as a matter of law in failing to dismiss the city's amended complaint for failure to exhaust administrative remedies. The BWC claims that the city was required to comply with the administrative review process set forth in R.C. 4123.291 and Adm.Code 4123-14-06 for challenges to "risk premium matters" before seeking relief in the court of common pleas and that because the city did not "protest" their premium rates through the administrative process, they are not entitled to judicial relief. The BWC further argues that exhaustion of administrative remedies is a condition precedent to the granting of equitable relief and that because the city did not plead, in its amended complaint, that it exhausted any administrative remedies, the city failed to state a claim upon which relief can be granted. The BWC's arguments are meritless.

**{¶56}** The determination of whether a complaint should be dismissed for failure to exhaust administrative remedies presents a question of law that we review de novo. *Martin v. Ohio Dept. of Rehab. & Corr.*, 140 Ohio App.3d 831, 835, 749 N.E.2d 787 (4th Dist.2001). "It is a 'long settled rule of judicial administration that no one is entitled to judicial relief for a supposed * * * injury until the prescribed administrative remedy has been exhausted.'" *State ex rel. Teamsters Local Union No. 436 v. Bd. of Cty. Commrs.*, 132 Ohio St.3d 47, 2012-Ohio-1861, 969 N.E.2d 224, ¶ 19, quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303

U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). Thus, a party must generally "exhaust any administrative remedy that could provide him with the relief he seeks" before seeking judicial intervention. *Driscoll v. Austintown Assocs.*, 42 Ohio St.2d 263, 273, 328 N.E.2d 395 (1975).

{¶57} Exhaustion of remedies is required to avoid "'premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.'" *State ex rel. Teamsters Local Union No. 436* at ¶ 19, quoting *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Exhaustion of administrative remedies is an affirmative defense, which the BWC bore the burden of proving. *AMM Property Invest., Inc. v. Cleveland,* 8th Dist. Cuyahoga No. 99848, 2014-Ohio-821, ¶ 3; *Cleveland Constr., Inc. v. Kent State Univ.*, 10th Dist. Franklin No. 09AP-822, 2010-Ohio-2906, ¶ 48.

{¶58} Where an administrative agency has no power to afford the relief sought or an administrative appeal would otherwise be futile, exhaustion of administrative remedies is not a prerequisite to seeking judicial relief. *State ex rel. Teamsters Local Union No. 436* at ¶ 23-24; *see also Kaufman v. Newburgh Hts.*, 26 Ohio St.2d 217, 219, 271 N.E.2d 280 (1971) ("'failure to exhaust administrative remedies available' may be a defense * * * only if interposed * * *, and if a remedy exists which is effectual to afford the relief sought"). In determining futility for exhaustion of remedies purposes, it does not matter that it may be improbable that the claimant will receive the requested relief. "'The focus is on the power of the administrative body to afford the requested relief, and not on the happenstance of the relief being granted.'" (Emphasis omitted.) *State ex rel. Teamsters Local Union No. 436* at ¶ 24, quoting *Nemazee v. Mt. Sinai Med. Ctr.*, 56 Ohio St.3d 109, 115, 564 N.E.2d 477 (1990); *see also McNally v. Cleveland*, 8th

Dist. Cuyahoga No. 92697, 2010-Ohio-512, ¶ 12 ("'[a] vain act is defined in the context of lack of authority to grant administrative relief and not in the sense of lack of probability that the application for administrative relief will be granted'"), quoting *Gates Mills Invest. Co. v. Pepper Pike*, 59 Ohio App.2d 155, 167, 392 N.E.2d 1316 (8th Dist.1978).

{¶59} Pursuant to R.C. 4123.291(A), any employer "desiring to file a request, protest, or petition" regarding certain categories of matters specified in the statute must file such with the adjudicating committee within 24 months after the administrator sends notice of the determination that is the subject of the request, protest or petition. Relevant to this case, the matters that the adjudicating committee has the authority to address includes "[a]ny decision relating to any other risk premium matter under Chapters 4121., 4123., 4131. of the Revised Code." R.C. 4123.291(B)(6); *see also* Ohio Adm.Code 4123-14-06(F).

{¶60} If an employer does not prevail before the adjudicating committee, the employer may appeal the decision of the committee to the administrator or the administrator's designee. R.C. 4123.291(B); Ohio Adm.Code 4123-14-06(E).

{¶61} Once again, this court's decision in *San Allen* controls the result here. As we explained in *San Allen*:

> [T]his case is materially different from * * * one in which an individual employer challenges a premium it has been assessed, based on a particular application of the BWC's rules, classifications, or calculations. *Compare Arth Brass & Aluminum Castings, Inc. v. Conrad*, 104 Ohio St.3d 547, 2004-Ohio-6888, 820 N.E.2d 900; *State ex rel. Cafaro Mgt. Co. v. Kielmeyer*, 113 Ohio St. 3d 1, 2007-Ohio-968, 862 N.E.2d 474; *State ex rel. RMS of Ohio, Inc. v. Ohio Bur. of Workers' Comp.*, 113 Ohio St.3d 154, 2007-Ohio-1252, 863 N.E.2d 160. In such cases, any "errors" impacting an individual employer (or even multiple employers) are fully correctable in the normal course upon administrative review. Because of the BWC's expertise in administering its own rules and regulations, it ordinarily should be given the opportunity to review the application of those rules and regulations to a particular factual context.

Plaintiffs' challenges to their rates, however, do not involve individualized decisions concerning particular employers' risk accounts, but rather, a system-wide challenge to the manner in which premium rates were set by the BWC and a request for system-wide relief. Although the adjudicating committee (or, upon further review, the administrator or his [or her] designee) may have had the authority to make individual, manual premium rate adjustments under certain circumstances, nothing in the record (or the applicable rule and statute) suggests that the plaintiff class had an administrative remedy pursuant to which it could have required the BWC to change the manner in which it set premium rates. *See, e.g., AMM Peric Property Invest., Inc. v. Cleveland*, 8th Dist. Cuyahoga No. 99848, 2014-Ohio-821, ¶ 4, 6, 12 (where administrative agency lacks power to grant relief sought, administrative remedy may be inadequate); *Bowen v. New York*, 476 U.S. 467, 484-485, 106 S.Ct. 2022, 90 L. Ed.2d 462 (1986) (exhaustion of administrative remedies would have been futile and, therefore, was not required where challenged agency action involved a "systemwide, unrevealed policy" that was inconsistent with established regulations and did not "depend on the particular facts of the case before it"); *New Mexico Assn. for Retarded Citizens v. New Mexico*, 678 F.2d 847, 851 (10th Cir.1982) (plaintiff class was not required to exhaust administrative remedies before filing lawsuit where the "gravamen" of the lawsuit was that "the entire special education service system offered by the State is infirm" and the remedies offered at the administrative level did not include "a restructuring of the State's system" as sought by the class); *see also Espinoza-Gutierrez v. Smith*, 94 F.3d 1270, 1273 (9th Cir.1996) (exhaustion of administrative remedies doctrine did not bar review of a question concerning the validity of an INS regulation due to conflict with a statute).

*San Allen*, 2014-Ohio-2071, 11 N.E.3d 739, at ¶ 73-74.

{¶62} As in *San Allen*, the city's contention that the BWC charged it excessive worker's compensation premiums is based on a system-wide challenge to the manner in which premium rates were set by the BWC, i.e., that the city was charged unlawful and unfair rates due the manner in which discounts given to group-rated PECs were funded under the BWC's group-rating program. There is nothing in the record in this case to suggest that the adjudicating committee (or, upon further review, the administrator or his or her designee) had the authority to address the city's claim that the BWC's group-rating program, the method by which the BWC set premiums as a result of that program and the excessive premiums the city was allegedly charged

as a result of that program, were unlawful.   Thus, the BWC did not show that the wrongs alleged by the city could have been corrected by the administrative review process.   Because adjudication of the lawfulness of the BWC's rating system and the relief sought by the city were outside the scope of the administrative review process set forth in R.C. 4123.291, the trial court committed no error in concluding that the city was not obligated to exhaust administrative remedies prior to filing its complaint.   The BWC's first assignment of error is overruled.

**B.   Summary Judgment**

{¶63} In its second assignment of error, the BWC contends that the trial court erred in granting the city's motion for summary judgment as to liability and denying its own motion for summary judgment on the city's unjust enrichment claim.

**1.   Standard of Review**

{¶64} We review summary judgment rulings de novo, applying the same standard as the trial court.   *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).   We accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate.

{¶65} Under Civ.R. 56, summary judgment is appropriate when no genuine issue as to any material fact exists and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶66} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate its entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).   If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden,

the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

{¶67} "Although courts are cautioned to construe the evidence in favor of the nonmoving party, summary judgment is not to be discouraged where a non-movant fails to respond with evidence supporting the essentials of [its] claim." *Mayhew v. Massey*, 2017-Ohio-1016, 86 N.E.3d 758, ¶ 11 (7th Dist.), citing *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993). Civ.R. 56 must be applied in a manner that balances the right of the nonmoving party to have a factfinder try claims or defenses that are adequately based in fact with the right of the moving party to demonstrate, prior to trial, that the claims or defenses have no factual basis. *See, e.g., Mayhew* at ¶ 11, citing *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 11. In this case, the trial court struck the right balance.

### 2. The City's Unjust Enrichment Claim

{¶68} The city brought a claim against the BWC for unjust enrichment. The city contends that the BWC was unjustly enriched because the BWC charged nongroup-rated PECs, including the city, excessive workers' compensation premiums in order to subsidize unwarranted discounts given to group-rated PECs under its group-rating program in violation of Ohio law.

{¶69} Unjust enrichment occurs where "'a person has and retains money or benefits which in justice and in equity belong to another.'" *Smith v. Vaughn*, 174 Ohio App.3d 473, 2007-Ohio-7061, 882 N.E.2d 941, ¶ 10 (1st Dist.2007), quoting *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20; *Hummel v. Hummel*, 133 Ohio St. 520, 528, 14 N.E.2d 923 (1938). The purpose of an unjust enrichment claim is not to compensate the plaintiff for loss or damage suffered by the plaintiff, but to enable the plaintiff to recover the

benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it. *Johnson* at ¶ 21, citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954). Restitution is the remedy provided upon proof of unjust enrichment "to prevent one from retaining property to which he is not justly entitled." *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 256, 141 N.E.2d 465 (1957); *see also Santos*, 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441 at ¶ 11 ("restitution [is] available as the remedy for an unjust enrichment of one party at the expense of another"), citing Restatement of the Law, Restitution, Section 9 (1937).

{¶70} To prevail on a claim for unjust enrichment, a plaintiff must prove by a preponderance of the evidence that: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit and (3) the defendant retained that benefit under circumstances in which it would be unjust for him to retain that benefit. *See, e.g., Patel v. Krushna SS L.L.C.*, 8th Dist. Cuyahoga No. 104655, 2018-Ohio-263,¶ 25; *Johnson* at ¶ 21; *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).

{¶71} After reviewing the materials submitted by the parties on summary judgment, the trial court found that the city had met its initial burden under Civ.R. 56, coming forward with evidence establishing the absence of any genuine issues of material fact as to the BWC's liability on the city's unjust enrichment claim, but that the BWC had not met its reciprocal burden of pointing to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact on that issue for trial. Following a thorough review of the record, we reach the same conclusion.

{¶72} Both in opposing the city's motion for summary judgment and in its own motion for summary judgment, the BWC focused primarily on its affirmative defenses rather than the

elements of the city's unjust enrichment claim. Likewise, the BWC's arguments on appeal are centered on several affirmative defenses. For this reason, we begin our review of the trial court's summary judgment ruling with the BWC's affirmative defenses.

### 3. The BWC's Affirmative Defenses

{¶73} The BWC contends that the trial court erred in failing to consider three of its affirmative defenses on summary judgment: (1) that Ohio Adm.Code 4123-17-17(C) precludes the city from recovering any premium overcharges; (2) that the city's unjust enrichment claim is barred, in whole or in part, by the statute of limitations set forth in R.C. 126.301 or 2307.05 and (3) that the city's unjust enrichment claim is barred by the voluntary payment doctrine.[13]

### a. Applicability of Two-Year Reimbursement Limitation in Ohio Adm.Code 4121-7-17(C)

{¶74} The BWC contends that because the city first brought its alleged premium overcharges to the BWC's attention in June 2013 when it filed its complaint and the city admits that the 2010 rate reforms resolved the issues with its premiums, the trial court should have granted summary judgment in favor of the BWC based on the "two-year limit on the recovery of alleged overcharges" in Ohio Adm.Code 4123-17-17(C). We disagree.

{¶75} Ohio Adm.Code 4123-17-17 governs "[a]uditing and adjustment of payroll reports." *See also State ex rel. Roberds, Inc. v. Conrad*, 86 Ohio St.3d 221, 223, 714 N.E.2d

---

[13]The BWC also asserts that it was not collaterally estopped, based on the *San Allen* decision, from asserting these affirmative defenses in this case. We need not address the BWC's collateral estoppel argument because the trial court expressly stated that it did not rely on collateral estoppel in deciding the city's motion for summary judgment; its decision was based on the summary judgment evidence presented by the parties. Likewise, we do not rely on the doctrine of collateral estoppel in resolving the issues raised in this appeal; we base our decision on the evidence presented by the parties in this case.

390 (1999).   The version of Ohio Adm.Code 4123-17-17(C) in effect at the time the BWC filed

its complaint[14] provides, in relevant part:

> (C)   The bureau shall have the right at all times * * * to inspect, examine or audit any or all books, records, papers, documents and payroll of * * * employers for the purpose of verifying the correctness of reports made by employers of wage expenditures as required by law and rule 4123-17-14 of the Administrative Code. The bureau shall also have the right to make adjustments as to classifications, allocation of wage expenditures to classifications, amount of wage expenditures, premium rates or amount of premium.   No adjustments, however, shall be made in an employer's account which result in reducing any amount of premium below the amount of contributions made by the employer to the fund for the periods involved, except in reference to adjustments for the semi-annual or adjustment periods ending within twenty-four months immediately prior to the beginning of the current payroll reporting period.   * * *   The twenty-four month period shall be determined by the date when such errors affecting the reports and the premium are brought to the attention of the bureau by an employer through written application for adjustment or from the date that the bureau provides written notice to the employer of the bureau's intent to inspect, examine, or audit the employer's records.

**{¶76}** The BWC cites *State ex rel. Able Temps, Inc. v. Indus. Comm. of Ohio*, 66 Ohio

St.3d 22, 607 N.E.2d 450 (1993), *State ex rel. Granville Volunteer Fire Dept. v. Indus. Comm. of*

---

[14]In its brief, the BWC quotes the current version of Ohio Adm.Code 4121-17-17(C), which reflects amendments effective July 1, 2015.   The current version states:

> The bureau shall have the right at all times to inspect, examine or audit any or all books, records, papers, documents and payroll of an employer for the purpose of verifying the correctness of reports made by employers as required by law.

> (1)   The bureau shall have the right to make adjustments as to classifications, allocation of wage expenditures to classifications, amount of wage expenditures, premium rates or amount of premium.

> (2)   Except as provided in rules 4123-17-14 and 4123-17-28 of the Administrative Code, adjustments in an employer's account which result in changes to the amount of premium due from an employer for a policy year shall be limited to the annual or adjustment periods ending within twenty-four months immediately prior to:

> (a)   The date when such error affecting the reports and the premium are brought to the attention of the bureau by an employer through written application for adjustment, or

> (b)   The date that the bureau provides written notice to the employer of the bureau's intent to inspect, examine, or audit the employer's records.

*Ohio*, 64 Ohio St.3d 518, 597 N.E.2d 127 (1992), and *State ex rel. Harry Wolsky Stair Builder, Inc. v. Indus. Comm. of Ohio*, 58 Ohio St.3d 222, 569 N.E.2d 900 (1990), for the proposition that "employers cannot recover alleged workers' compensation premium overcharges that were paid more than two years before demand for their repayment" pursuant to Ohio Adm.Code 4123-17-17(C). However, this case is distinguishable from those cases. Each of those cases involved the time period for which premium adjustments could be sought due to a misclassification of the employer's business or employees. *See Able Temps*, 66 Ohio St.3d 22, 607 N.E.2d 450 (where classification was invalidated by Ohio Supreme Court, period for which temporary employment agencies could obtain reimbursement of overpaid premiums was governed by two-year limitation in Ohio Adm.Code 4121-7-17(C)[15]); *Granville,* 64 Ohio St.3d 518, 597 N.E.2d 127 (where fire department paid workers' compensation insurance premiums to the state fund unaware of a statute designated volunteer firefighters as township employees for purposes of workers' compensation insurance, Ohio Adm.Code 4121-7-17(C)'s two-year limitation on reimbursement prohibited reimbursement of premiums beyond two years prior to the date that the classification error was brought to the attention of the BWC); *Harry Wolsky*, 58 Ohio St.3d 222, 569 N.E.2d 900 (two-year limitation in Ohio Adm.Code 4121-7-17(C) applied where employer sought a refund for premium overpayments after the BWC erroneously assigned the employer to a manual class with a higher risk classification with higher premium rates). That is not the situation here.

{¶77} Based on its plain language, Ohio Adm.Code 4123-17-17 does not preclude or limit the relief requested in this case. Although Ohio Adm.Code 4123-17-17(C) places a two-year limit on premium "adjustments" covered by the regulation, this limitation applies only

---

[15] Ohio Adm.Code 4121-7-17(C) was the predecessor to Ohio Adm.Code 4123-17-17(C).

to adjustments related to "errors affecting the [payroll] reports and the premium." *See also State ex rel. Aaron's, Inc. v. Ohio Bur. of Workers' Comp.,* 148 Ohio St.3d 34, 2016-Ohio-5011, 68 N.E.3d 757, ¶ 22 ("[t]he purpose of retroactive adjustment is to correct an error or mistake"). The city is not seeking an "adjustment" to its premiums due to any "error" relating to or affecting its payroll reports. The premium overcharges for which the city seeks restitution in this case were the result of an alleged deliberate policy decision by the BWC to charge excessive premiums to nongroup-rated PECs in order to subsidize unlawful discounts given to group-rated PECs under its group-rating program. As such, the two-year limitation on premium adjustments set forth in Ohio Adm.Code 4123-17-17(C) does not apply.

### b. Applicability of the Five-year Statute of Limitations in R.C. 126.301 and the Six-Year Statute of Limitations in R.C. 2305.07

**{¶78}** The BWC also argues that, based on the five-year statute of limitations set forth in R.C. 126.301 or the six-year statute of limitations set forth in R.C. 2305.07, the trial court erred by denying its motion for summary judgment as to any claim for premiums paid before June 28, 2008 (applying the five-year statute of limitations) or June 28, 2007 (applying the six-year statute of limitations). Once again, we disagree.

**{¶79}** R.C. 2305.07 provides: "Except as provided in sections 126.301 and 1302.98 of the Revised Code, an action upon a contract not in writing, express or implied, or upon a liability created by statute other than a forfeiture or penalty, shall be brought within six years after the cause thereof accrued." R.C. 126.301 provides: "Except for unclaimed funds under Chapter 169. of the Revised Code, an action against the state or an agency thereof for failure to make any distribution or other payment shall be brought within five years after the cause of action has accrued."

**{¶80}** The BWC argues that because this case is "an action against the state or an agency thereof," the five-year statute of limitations set forth in R.C. 126.301 governs the city's claim. The BWC cites no authority beyond R.C. 126.301 for this proposition. By its terms, however, R.C. 126.301 applies only to actions against the state or a state agency "for failure to make any distribution or other payment." This case does not involve the BWC's "failure to make any distribution or other payment" due the city. Rather, the city seeks the return of specific funds wrongfully collected by the state under its unlawful group-rating program. Accordingly, R.C. 126.301 does not apply.

**{¶81}** Alternatively, the BWC argues that the city's claim is "an action * * * upon a liability created by statute" governed by the six-year statute of limitations in R.C. 2305.07.

**{¶82}** The city's claim in this case is a claim for unjust enrichment. A six-year statute of limitations applies to claims for unjust enrichment. *See, e.g., State ex rel. Cty. of Cuyahoga v. Jones Lang Lasalle Great Lakes Co.*, 8th Dist. Cuyahoga No. 104157, 2017-Ohio-7727, ¶ 118, citing *Hambleton*, 12 Ohio St.3d at 182, 465 N.E.2d 1298; *Pomeroy v. Schwartz*, 8th Dist. Cuyahoga No. 99638, 2013-Ohio-4920, ¶ 41. "'[A] claim for unjust enrichment accrues on the date that money is retained under circumstances that make it unjust to do so.'" *Pomeroy* at ¶ 41, quoting *Palm Beach Co. v. Dun & Bradstreet*, 106 Ohio App.3d 167, 175, 665 N.E.2d 718 (1st Dist.1995). The discovery rule has not been extended to unjust enrichment claims. *Jones Lang* at ¶ 118; *Drozeck v. Lawyers Title Ins. Corp.*, 140 Ohio App.3d 816, 749 N.E.2d 775 (8th Dist.2001); *see also Marok v. Ohio State Univ.*, 10th Dist. Franklin No. 13AP-12, 2014-Ohio-1184, ¶ 25.

**{¶83}** Citing *Zion Nursing Home, Inc. v. Creasy*, 6 Ohio St.3d 221, 224, 452 N.E.2d 1272 (1983), and several other "periodic payment" cases, the BWC contends that each of the city's

workers' compensation premium payments has "its own statute of limitations" and that, therefore, the six-year statute of limitations bars the city from obtaining restitution of any premiums paid prior to June 28, 2007. None of those cases involves an unjust enrichment claim.

{¶84} We find this court's prior decision in *Pomeroy* instructive in determining when the city's unjust enrichment claim accrued in this case. In *Pomeroy*, an insurance agent and his insurance agency (collectively, the "agent") brought an action against a commercial client and its president (collectively, the "client") to recover funds the agent advanced to the client to pay non-covered "trail claims," after the client failed to purchase "trail claims coverage" when it switched health insurance plans from a self-insured plan to a fully insured plan in November 2002. *Pomeroy*, 2013-Ohio-4920, at ¶ 5-7. To avoid losing the client, from February 2003 to September 2003, the agent paid a number of the unpaid "trail claims" himself. *Id.* at ¶ 8. The relationship between the client and insurance agent deteriorated and, in April 2006, the agent demanded that the client reimburse him for the "trail claims" payments he had made in 2003. *Id.* at ¶ 11-13. In November 2011, eight years after he made the last "trail claims" payment, the agent sued the client, asserting various claims, including a claim for unjust enrichment, based on his "trail claims" payments. *Id.* at ¶ 16. The trial court granted summary judgment in favor of the client on the agent's unjust enrichment claim. The trial court found that the unjust enrichment claim accrued in September 2003, when the last "trail claims" payment was made — rather than the date repayment was first demanded —  and was, therefore, time barred under the applicable six-year statute of limitations. *Id.* at ¶ 17, 41-42. This court agreed. The court explained: "This is the date the last of the benefit that was allegedly (1) conferred to [the

defendant], (2) with [the defendant's] knowledge, and (3) was retained, under circumstances where it would be unjust without payment." *Id.* at ¶ 42, 45-46.

{¶85} The court noted its decision was consistent with a decision by the First District in *Palm Beach*. *Id.* at ¶ 44-45. In *Palm Beach*, the plaintiff had paid the defendant for credit information from 1979 to 1982, relying on the defendant's assurances that it would sell it only so much credit information as it could use. In 1989, the plaintiff learned that it had paid for more units of credit information in 1979-1982 than it had used. *Palm Beach,* 106 Ohio App.3d at 169-170, 665 N.E.2d 718. Four years later, the plaintiff filed suit against the defendant, asserting various claims, including a claim for unjust enrichment seeking restitution of the excess payments. *Id.* at 170. The trial court found that the plaintiff's unjust enrichment claim accrued in 1982, i.e., when the last of the allegedly excessive charges was paid and was, therefore, time-barred. *Id.* The First District affirmed the trial court's judgment, concluding that the plaintiff's unjust enrichment claim accrued "at the latest * * * in 1982 when the last of the alleged overcharges, or false billings or accountings, occurred." *Id.* at 175.

{¶86} The Ninth District reached a similar conclusion in *Desai v. Franklin*, 177 Ohio App.3d 679, 2008-Ohio-3957, 895 N.E.2d 875 (9th Dist.). In *Desai,* the plaintiff and defendant were business partners. The plaintiff resigned in 2000 and filed suit against the defendant in 2002, alleging that the defendant was unjustly enriched because he had underpaid the plaintiff for many years. *Id.* at ¶ 2-5. At trial, a jury awarded the plaintiff $301,597.34, which covered payments the defendant failed to make to the plaintiff from 1987 to 2000. *Id.* at ¶ 8. On appeal, the defendant argued that the plaintiff could only recover the payments due for the six years preceding the 2002 filing of the complaint and that the jury's award should, therefore, be reduced to $128,705.67. *Id.* at ¶ 11, 13.

**{¶87}** The Ninth District disagreed and held that the plaintiff's entire unjust enrichment claim, i.e., for payments dating back to 1987, did not accrue until the last point in time that the plaintiff conferred a benefit on the defendant, which was in 2000 when the plaintiff resigned. *Id.* at ¶ 23.

**{¶88}** In *Bank of Am., N.A. v. Darkadakis*, 2016-Ohio-7694, 76 N.E.3d 577 (7th Dist.), a homeowner claimed that the bank lacked standing to bring a foreclosure action because he did not sign the note or mortgage, notwithstanding the fact that he had initialed every page of the mortgage and the mortgage was used to pay off a prior note and mortgage for which he was liable. *Id.* at ¶ 2-7. The bank brought an unjust enrichment claim against the homeowner, which the homeowner asserted was time-barred. *Id.* at ¶ 6. The trial court granted summary judgment in favor of the bank and entered a decree of foreclosure. The home owner appealed. *Id.* at ¶ 8-12. Among the issues raised on appeal was the statute of limitations on the bank's unjust enrichment claim. The homeowner claimed that the statute of limitations began to run in September 2004 when the bank's mortgage was used to pay off the homeowner's prior mortgage. *Id.* at ¶ 41. The Seventh District disagreed. It indicated that because payments were made on the note from 2004 to 2012, the bank's unjust enrichment claim could not have accrued until those payments stopped. The court explained:

> This reasoning * * * fails to acknowledge payments made on the September 4, 2004 note secured by the mortgage. It may be unjust to hold the accrual date as September 4, 2004, because it would allow [the homeowner] to unilaterally control the statutory time. *See Pomeroy*, 2013-Ohio-4920 at ¶ 46. [The homeowner] could ensure the mortgage was paid for six years and then stop payment but retain the benefit of having his previous mortgage paid off and getting to keep his house free and clear of debt. * * * The benefit was being conferred and retained as long as payments on the note were made. Conference and retention of the benefit would not cease until [the homeowner] was in default on the note. Thus, the cause of action may not accrue until payments were no

longer made on the note. The trial court found the note went into default in February 2012.

*Id.* at ¶ 50-51. The court ultimately held that the statute of limitations on the bank's unjust enrichment claim did not accrue until June 2012 when the bank filed its foreclosure action because that was when the homeowner first asserted his claim that the bank could not foreclose on his interest in the property. *Id.* at ¶ 52-53.

**{¶89}** In each of these cases, where one party conferred benefits on another, with the other's knowledge, over a period of time, the courts did not regard each benefit conferred as giving rise to a separate cause of action with a separate statute of limitations. Rather, the courts looked at the entire period of time over which the party conferred benefits as giving rise to a single claim for unjust enrichment, subject to a single statute of limitations that accrued when the last benefit was conferred that unjustly enriched the defendant.

**{¶90}** Accordingly, we conclude that the city's cause of action for unjust enrichment did not accrue until the city made its last premium "overpayment," i.e., its last premium payment for policy year 2009, which was the last point in time the BWC allegedly unjustly received a benefit from the city. We believe that such a rule is more consistent with the equitable nature of an unjust enrichment claim than the "payment-by-payment" approach to the statute of limitations advocated for by the BWC.[16] Because, the city's 2013 complaint was within the six-year

---

[16] This is also more consistent with the manner in which the court determined equitable relief should be awarded in the *San Allen* case. Although there was no statute of limitations issue in that case, this court held that it was not appropriate for the trial court to consider the plaintiffs' unjust enrichment claim on a policy-year-by-policy basis (or a payment-by-payment basis) and simply award the plaintiffs the sum of the premium overcharges class members received during each year within the class period in which the class members were nongroup rated. Rather, this court held that it was necessary for the trial court to consider the class period as a whole and include an offset for the subsidy benefits class members who were group rated during part of the class period received during the years within the class period in which they were group rated.

limitations period applicable to unjust enrichment claims, the trial court did not err in concluding that the city's claim was not time-barred, in whole or in part, under R.C. 126.301 or 2307.05.

### c. Voluntary Payment Doctrine

**{¶91}** The BWC also contends that the city's unjust enrichment claim is barred by the voluntary payment doctrine. The voluntary payment doctrine provides that "[i]n the absence of fraud, duress, compulsion or mistake of fact, money, voluntarily paid by one person to another on a claim of right to such payment cannot be recovered merely because the person who made the payment mistook the law as to his liability to pay." *State ex rel. Dickman v. Defenbacher*, 151 Ohio St. 391, 395, 86 N.E. 2d 5 (1949); *Consol. Mgmt. v. Handee Marts*, 109 Ohio App.3d 185, 189, 671 N.E.2d 1304 (8th Dist.1996); *Meeker R&D, Inc. v. Evenflo Co.*, 2016-Ohio-2688, 52 N.E.3d 1207, ¶ 75 (11th Dist.); *see also Culberson Transp. Serv. Inc. v. John Alden Life Ins. Co.*, 10th Dist. Franklin No. 96 APE11-1501, 1997 Ohio App. LEXIS 2854, *18 (June 30, 1997) ("[w]hen a party with knowledge of the facts, but without legal liability to do so, pays money voluntarily, that person has no claim to recovery for the monies so paid"), A mistake of law occurs when a person, having full knowledge of the facts, reaches an erroneous conclusion regarding their legal effect. "It is a mistaken opinion or inference, arising from an imperfect or incorrect exercise of judgment on facts as they are real." *Consol. Mgmt.* at 189; *see also Sheet Metal Workers Local 98 v. Whitehurst*, 5th Dist. Knox No. 03 CA 29, 2004-Ohio-191, ¶ 33 (defining a mistake of law as "'a mistake of a person who knows the facts of the case but is ignorant of their legal consequence'"), quoting 69 Ohio Jurisprudence 3d, Mistake, Section 9, at 13-14 (1986). A mistake of fact is a "mistaken supposition of the existence of a specific fact." *Sheet Metal Workers Local 98* at ¶ 34; *see also Meeker R&D* at ¶ 63-64 (defining mistake of fact as "'a mistake not caused by the neglect of a legal duty_on the part of the person making the

mistake, and consisting in (1) an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract; or (2) belief in the present existence of a thing or material to the contract which does not exist, or in the past existence of such thing which has not existed'"), quoting *Black's Law Dictionary* (5th Ed.).

{¶92} The BWC contends that there is no genuine issue of material fact that the voluntary payment doctrine bars the city's unjust enrichment claim because (1) the city did not allege any fraud, duress, compulsion or mistake of fact in its amended complaint and (2) the city "knowingly paid any allegedly 'excess premiums.'" The city contends that the voluntary payment doctrine does not apply because (1) the evidence shows that it lacked the "specific knowledge" necessary for application of the doctrine and (2) its premium payments were not "voluntary" because they were "compelled by law" and because the city's workers' compensation coverage would have immediately lapsed and the city would have been responsible for payment of all claims made during the lapsed period as well as fines, penalties (and possibly liens) assessed against it by the BWC. We do not decide whether the other requirements of the voluntary payment doctrine have been met because, based on a thorough review of the record, we find no evidence that the city made any of the premium payments at issue with full knowledge of the relevant facts.

{¶93} The BWC's claim that the city "knowingly paid any allegedly 'excess premiums'" is based on the testimony of Eduardo Romero, the city's risk manager. Romero began working for the city in 2002. Prior to working for the city, Romero worked for the BWC. Romero testified that when he worked for the BWC he became aware of "BWC studies, actuarial studies" that showed that nongroup-rated employers were subsidizing group-rated employers who were receiving a "humongous discount" and that this was "internal knowledge within the [BWC]."

He testified that he "first became aware of the possibility that these rate differences were creating problems for nongroup-rated employers" in the late 1990s. He explained:

> Q. And do you recall precisely how you became aware?
>
> A. I became aware in the '90s from internal discussions that I overheard other people talking about. * * *
>
> Q. * * * Did you understand at the time what the cause of these alleged subsidies was?
>
> A. My understanding was that [the] BWC, in reaction to these formulation of groups, employer groups, in order to get superior discounts to their premiums, were being offset, they were encouraging the formulations of these groups in order to lower the actual costs of Workers' Compensation for a select group of people.

{¶94} He further testified that the "humongous discounts and subsidies" became public knowledge in the early 2000s and that he "remember[ed] reading about it in the media" at that time. Romero testified that he had no "firsthand knowledge" of the impact that group rating had on the city or the basis for the assertion that nongroup-rated employers were subsidizing group-rated employers. He further testified that he had no "specific discussions" with anyone about these alleged subsidies while he worked at the BWC.

{¶95} Even assuming the knowledge Romero acquired while he was an employee of the BWC could be properly imputed to the city, the BWC presented no evidence that Romero knew that the problems that were being reported in the early 2000s related to nongroup-rated PEC employers like the city. Bravender and Carlson testified that the early studies commissioned by the BWC focused on the effect of group rating on private employers and that it was not until 2004, when the BWC's actuarial section, in conjunction with Mercer Oliver Wyman, analyzed the effect of the group-rating program on private employers and PECs, or 2006, when Pinnacle issued its study, that any actuarial study specifically addressed whether premium inequity existed

between group-rated and nongroup-rated public employers under the BWC's group-rating plan. The BWC did not offer any evidence in its opposition to the city's summary judgment motion or its own motion for summary judgment that the results of these later studies were available to Romero or the city at time the city made any of the premium payments at issue.[17]    Accordingly, the trial court did not err in rejecting the BWC's voluntary payment defense.

### 4.    Evidence on the Issue of Liability

### a.    Statutory Requirements and Premium Overcharges

{¶96} The BWC argues that even if the trial court did not err in rejecting its affirmative defenses, it still erred in granting summary judgment to the city on the issue of liability because the city failed to show that there were no genuine issues of material fact that the BWC overcharged the city for its workers' compensation premiums and violated its statutory duties under R.C. 4123.29, 4123.34 or 4123.39.

{¶97} R.C. 4123.39 provides, in relevant part:

The administrator of workers' compensation shall determine the amount of money to be contributed under section 4123.38 of the Revised Code by the state itself and each county and each taxing district within each county.  In fixing the amount of contribution to be made by the county, for such county and for the taxing districts therein, the administrator shall classify counties and other taxing districts into such groups as will equitably determine the contributions in accordance with the relative degree of hazard, and also merit rate such individual counties, taxing districts, or groups of taxing districts in accordance with their individual accident experience so as ultimately to provide for each taxing subdivision contributing an amount sufficient to meet its individual obligations
and to maintain a solvent public insurance fund. * * *

---

[17] The BWC asserts in its brief that Romero testified that he knew prior to January 2002 that *"Cleveland* had 'overpaid' workers' compensation premiums," that he first learned of "*Cleveland's* payment of the allegedly 'excess premiums,'" when he worked for the BWC and that "this issue was 'public knowledge' in the early 2000s." (Emphasis added.)  This is not correct.  As indicated above, Romero's testimony was much more general and did not establish that he knew in the 1990s or early 2000s that the city, specifically, was being overcharged for its workers' compensation premiums based on the impact of group rating.

{¶98} Former R.C. 4123.29(A)(4)(c) and 4123.34(C) further require the BWC to "consider an employer group as a single employing entity for purposes of retrospective rating" and to "develop fixed and equitable rules controlling the rating system, which rules shall conserve to each risk the basic principles of workers' compensation insurance."

{¶99} As detailed above, the city presented evidence of numerous actuarial studies and testimony by BWC representatives establishing that under the BWC's group-rating program, group-rated employers received excessive, unwarranted discounts off their workers' compensations premiums and that nongroup-rated employers, including PECs like the city, were charged higher premiums to make up for and subsidize those discounts. The evidence showed that during the time period at issue, the BWC used an inflated off-balance factor in calculating workers' compensation premiums for both private and PEC employers, resulting in higher premiums for all nongroup-rated employers, including the city. The city further showed that the BWC's use of an inflated off-balance factor adversely impacted the city's premiums both when it was experience rated (from 1997 to 2002) and when it was retrospectively rated (from 2003 to 2009) because the minium premium it paid as a retrospectively rated employer was a percentage of the experience-rated premium it would have otherwise paid if it were not retrospectively rated.

{¶100} The city presented evidence that the BWC's group-rating program, as it impacted nongroup-rated PECs, was inequitable and violated Ohio law. In *San Allen*, this court held that the BWC's group-rating program violated former R.C. 4123.29(A)(4)(c) because the BWC's group-rating plans were prospective group-rating plans and that statute by its terms, authorized only "retrospective" group-rating plans. The *San Allen* court also held that, as applied to private employers, the group-rating program was inequitable and unlawful under R.C. 4123.34(C) and

that the BWC was unjustly enriched by the premium overcharges it received from class members who were nongroup rated throughout the class period.

{¶101} Bravender, Carlson and Pedrick testified that the same inequities in the group-rating program at issue in *San Allen* with respect to nongroup-rated private employers also existed with respect to nongroup-rated PEC employers like the city — i.e., the difference between the inequities from the group-rating program as applied to private and PEC employers was a matter of degree, not of kind.

{¶102} The city's evidence supports the conclusion that, as applied to nongroup-rated PECs like the city, the BWC's group-rating plan violated R.C. 4123.34(C) and 4123.39 as well as former R.C. 4123.29(A)(4)(c). The BWC's group-rating program violated the mandate under R.C. 4123.34(C) that the BWC "develop fixed and equitable rules controlling the rating system, which rules shall conserve to each risk the basic principles of workers' compensation insurance" and did not result in an "equitabl[e] determin[ation] [of] contributions in accordance with the relative degree of hazard" and "merit rat[ing] * * * in accordance with * * * individual accident experience" as required under R.C. 4123.39.

{¶103} The BWC asserts that it "presented a host of evidence" on summary judgment that "disputed whether Cleveland was overcharged" and "rebutted whether the Bureau violated various provisions of the Ohio Revised Code and * * * was unjustly enriched"; however, the record reflects otherwise. The BWC did not present any evidence on summary judgment challenging the actuarial studies and testimony from Bravender, Carlson and Pedrick regarding the inequities in the group-rating program as applied to both private employers and PECs. Further, the BWC did not dispute that it used an inflated off-balance factor in order to fund

excessive discounts given to group-rated employers under its group-rating program, resulting in higher premiums for nongroup-rated employers.

{¶104} Although the BWC offered deposition testimony from its expert, Josephson, in opposing the city's motion for summary judgment, that testimony did not demonstrate the existence of any genuine issue of material fact on the issue of liability. Josephson estimated that the city paid $2.7 million in higher premiums from 1997 to 2009 as a result of the BWC's group-rating program. Josephson testified that he was not asked to evaluate whether the city was "overcharged" for its workers' compensation premiums during the time period at issue and, therefore, did not formulate an opinion on that issue. He did not consider whether the city's premiums during this time period were "fair" given the impact of group rating and had no opinion as to whether the rating system violated Ohio law as applied to nongroup-rated PEC employers. Josephson testified that his opinions would not change even if the BWC "may not have followed statutory requirements in this case related to Cleveland."

### b. "Unjust" Enrichment

{¶105} The BWC also argues that the trial court applied an "incorrect standard" when ruling on the parties' motions for summary judgment, failing to "balance the equities" and consider the "totality of the circumstances." It contends that a genuine issue of material fact exists as to whether the BWC was "actually unjustly enriched" because (1) the "alleged premium overcharges" in this case were "not nearly of the same magnitude as those experienced by private employers" in *San Allen* and did not "fall outside the general variability of rate-making" and (2) there were "material factual disputes" regarding the "calculation of the alleged premium overcharges" that precluded summary judgment on the city's unjust enrichment claim.

**{¶106}** "'Enrichment alone'" is insufficient to "'invoke the remedial powers of a court of equity.'" *Chestnut v. Progressive Cas. Ins. Co.,* 166 Ohio App.3d 299, 2006-Ohio-2080, 830 N.E.2d 751, ¶ 30 (8th Dist.), quoting *Directory Servs. Group v. Staff Builders Internatl.,* 8th Dist. Cuyahoga No. 78611, 2001 Ohio App. LEXIS 3108 (July 12, 2001). Because the city sought equitable relief based upon a claim of unjust enrichment, it was required to "go further and show that under the circumstances,'" it has "'superior equity'" so that "'it would be unconscionable for [the BWC] to retain the benefit.'" *United States Health Practices, Inc. v. Blake*, 10th Dist. Franklin No. 00AP-1002, 2001 Ohio App. LEXIS 1291,*6 (Mar. 22, 2001), quoting *Katz v. Banning*, 84 Ohio App.3d 543, 552, 617 N.E.2d 729 (10th Dist.1992). This requires consideration of "the sum of [the] circumstances, as well as the equities involved in the case." *United States Health Practices* at *8.

**{¶107}** As this court explained in *San Allen*, a plaintiff is not always entitled to equitable restitution, as a matter of law, whenever funds are unlawfully collected and retained by the state. "Equity * * * demands that, in fashioning an equitable remedy, the court look at the full picture." *San Allen*, 2014-Ohio-2071, 11 N.E.3d 739, at ¶ 174.

> [W]here the state collects and retains funds to which the state is not lawfully entitled, those funds must be returned as the equities require. * * * In certain cases, the unlawful collection and retention of funds by the state may, in and of itself, constitute a sufficient basis for an award of equitable restitution, i.e., where the only issue is whether the collection and retention of funds by the state was unlawful and there is no dispute, once the state's conduct is determined to be unlawful, that (1) the state was unjustly enriched by its unlawful collection and retention of funds and (2) the equities require return of the funds. *See, e.g., State ex rel. Minutemen* [*, Inc. v. Indus. Comm.*, 62 Ohio St.3d 158, 161, 580 N.E.2d 777 (1991)]; *Arth Brass* [*& Aluminum Castings, Inc. v. Conrad*], 104 Ohio St.3d 547, 2004-Ohio-6888, 820 N.E.2d 900; *Judy* [*v. Ohio Bur. of Motor Vehicles*], 100 Ohio St.3d 122, 2003-Ohio-5277, 797 N.E.2d 45. In others, * * * where there are a number of equitable considerations bearing on whether the state was unjustly enriched and, if so, the extent to which it was unjustly enriched, those considerations must be weighed and a determination of unjust enrichment made

before a court may properly award equitable restitution on a unjust enrichment claim.

*San Allen* at ¶ 126.

{¶108} As this court stated in *San Allen*, we recognize that rate-making is "not an exact science." *San Allen* at ¶ 105, fn. 21. If the only evidence in the record was that the BWC had charged the city 2.2% to 4% in higher premiums than it arguably should have charged the city due to the "general variability of rate-making," perhaps it would be that the equities would not require restitution of the overcharges. However, that is not this case. In determining whether to award equitable relief and, if so, the amount of restitution to be awarded, the trial court was required to consider the "totality of the circumstances." This is not a case in which employers were overcharged for their premiums due to a difference of opinion in actuarial assumptions or because the loss experience turned out to be better or worse than expected — elements within the "general variability of rate-making." In this case, the "totality of the circumstances" included undisputed evidence that the BWC knowingly overcharged nongroup-rated PEC employers, including the city, for their workers' compensation premiums in order to fund excessive premium discounts for group-rated employers. Undisputed evidence further established that the BWC continued to operate its inequitable rating system long after its actuarial consultants warned the BWC that the group-rating program was creating substantial premium inequity between group-rated and nongroup-rated employers. The trial court properly considered the "totality of the circumstances" in concluding that the BWC had been unjustly enriched and granting summary judgment in favor of the city on the issue of liability.

{¶109} The parties' factual disputes regarding the "calculation of the alleged premium overcharges," including the BWC's challenges to Schwartz's assumptions and methodology and

its claim that the minimum premiums the city paid during 2003-2009 did not fully compensate the BWC for the risk the city transferred to the BWC under its retrospective-rating plan, did not preclude summary judgment as to liability. Those factual disputes involved the extent to which the city was entitled to equitable restitution on its unjust enrichment claim — as to which the trial court denied summary judgment.

{¶110} The record reflects that the city met its burden on summary judgment on the issue of liability. The city showed that there was no genuine issue of material fact that it conferred benefits on the BWC in the form of excessive premium payments and that the BWC had knowledge of the benefits conferred. If nongroup-rated employers had not paid the excessive premiums they were charged, the BWC would have experienced a shortfall in the total premiums collected due to the large discounts it gave group-rated employers under its group-rating plan.

{¶111} The city also showed that there was no genuine issue of material fact that these benefits were conferred under circumstances in which it would be unjust to allow the BWC to retain them.

{¶112} Once the city met its burden, the burden shifted to the BWC. However, the BWC did not meet its reciprocal burden. It did not point to any evidence of specific facts demonstrating the existence of a genuine issue of fact for trial on these issues.

{¶113} Accordingly, the trial court did not err in entering summary judgment in favor of the city as to liability. The BWC's second assignment of error is overruled.

## C. Trial on Restitution

### 1. Motion in Limine to Exclude Evidence of Affirmative Defenses

{¶114} In its third assignment of error, the BWC contends that the trial court abused its discretion by denying the BWC an opportunity to assert at trial that Ohio Adm.Code

4123-17-17(C), the statute of limitations and the voluntary payment doctrine barred or limited the restitution the city could properly recover on its unjust enrichment claim.

{¶115} Prior to trial, the city filed a motion in limine to preclude the BWC from presenting evidence of and arguing at trial any of the affirmative defenses it had relied upon in opposing the city's motion for summary judgment. The trial court granted the motion, indicating that the BWC would not be permitted to "relitigat[e] the issue [of liability] with respect to the affirmative defenses" at trial. The BWC then filed written offers of proof setting forth anticipated testimony from Romero and other evidence it would have presented at trial related to five affirmative defenses: (1) the voluntary payment doctrine, (2) Ohio Adm.Code 4123-17-17(C), (3) the statute of limitations, (4) laches and (5) "equitable discretion when examining the totality of the circumstances."[18]

{¶116} We review a trial court's ruling on a motion in limine for abuse of discretion. *See, e.g., Cohen & Co. v. Breen*, 8th Dist. Cuyahoga No. 100775, 2014-Ohio-3915, ¶ 18. A trial court abuses its discretion when its decision is unreasonable, arbitrary or unconscionable. The trial court did not abuse its discretion in granting the city's motion in limine in this case.

{¶117} The trial court had already considered and rejected each of the affirmative defenses at issue when ruling on the parties' cross-motions for summary judgment. For the reasons explained above, these affirmative defenses were not meritorious and the trial court did not err in granting summary judgment in favor of the city on liability notwithstanding these affirmative defenses. Accordingly, the trial court did not abuse its discretion in granting the city's motion in limine. The BWC's third assignment of error is overruled.

---

[18] On appeal, the BWC does not contend that the trial court erred in granting the motion with respect to its defenses of laches and "equitable discretion when examining the totality of the circumstances."

## 2. Manifest Weight of the Evidence

{¶118} The BWC's fourth and fifth assignments of error involve challenges based on the manifest weight of the evidence. In its fourth assignment of error, the BWC contends that the trial court's denial of its motion to dismiss the city's claim under Civ.R. 41(B)(2) was against the manifest weight of the evidence because Schwartz's testimony was not based on "actuarially sound assumptions." In its fifth assignment of error the BWC contends that the trial court's restitution award should be reversed as against the manifest weight of the evidence because (1) the premium overcharges were not material and did not "fall outside the general variability of rate-making so as to require the BWC to pay restitution," (2) the BWC's rate-making process is prospective and adjustments due to changes in the ratemaking process are applied to future premiums, not as refunds related to prior periods, (3) Schwartz failed to use actuarially sound principles in calculating the amount of the premium overcharges and (4) the trial court's restitution award does not account for the fact that, during the years the city was retrospectively rated, the minimum premiums the city paid did not fully compensate the BWC for the risk it transferred to the BWC. None of these arguments is persuasive.

{¶119} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). When conducting a manifest weight review, this court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d

517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001). However, in weighing the evidence, we "must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Seasons Coal* at 80, fn. 3, quoting 5 *Ohio Jurisprudence 3d*, Appellate Review, Section 60, at 191-192 (1978).

{¶120} First, we already considered and rejected the BWC's materiality and "rate-making" arguments in reviewing the BWC's second assignment of error.

{¶121} With respect to the claimed deficiencies in Schwartz's testimony, the BWC stipulated that Schwartz was qualified as an actuarial expert. The BWC did not object to or move to exclude any of his testimony as unreliable under Evid.R. 702(C). Indeed, the BWC specifically stated, when arguing its Civ.R. 41(B)(2) motion, that it was not seeking to strike Schwartz's testimony.

{¶122} The methodology Schwartz applied in this case was similar to the approach he used when calculating the restitution due the plaintiff class in *San Allen*. In that case, this court held that the BWC's arguments regarding the claimed deficiencies in Schwartz's opinions and calculations did not preclude the trial court from relying on that testimony in determining the amount of restitution to be awarded. *San Allen*, 2014-Ohio-2071, 11 N.E.3d 739, at ¶ 143-145. We reach the same conclusion here.

{¶123} At trial, Schwartz and Josephson offered two competing methodologies for determining the amount of restitution, if any, to be awarded the city on its unjust enrichment

claim. Each expert's opinions and calculations (and alleged deficiencies in those opinions and calculations) were explored at length by the parties on direct and cross-examination.

{¶124} As detailed above, the BWC criticized Schwartz's approach because Schwartz used a single off-balance factor of 1.01 for all years and failed to take into account the BWC's implementation of the group break-even factor and reduction of the maximum credibility when calculating the impact of group rating on the city's premiums. Schwartz testified that he selected a single value of 1.01 — the off-balance factor used by the BWC in 2010 — for all years when calculating premium overcharges because 2010 was the year closest to the historical period at issue and "actuaries often rely on the data closest to what you're trying to estimate." He testified that if he had used the uniform off-balance factor used by the BWC in 2011 or 2012 (or an average of the uniform off-balance factors used in 2010 to 2012), the amount of the overcharge would have been higher. He testified that the average of the uniform off-balance factors for all six years after rate reform was put into effect (i.e., from 2010 to 2015) was 1.018, supporting his opinion that 1.01 is "a pretty good actuarial value."

{¶125} Schwartz testified that he did not include a "break-even factor" or a credibility limit of 77 percent in his calculations because the break-even factor and limit on maximum credibility were meant to increase the premiums paid by group employers and were not intended to impact the premiums paid by nongroup-rated employers "in any material way." He claimed that because neither a break-even factor nor a credibility limit of 77 percent was used at any point during 1997-2009, such elements would not have an effect on the experience modifiers used during that time period.

{¶126} The city, in turn, criticized Josephson's inclusion of a group break-even factor and a 77 percent limit on credibility in his calculations of the impact of group rating on the city's

premiums because they did not exist prior to 2010. The city also criticized the assumptions Josephson used in calculating his recalculated off-balance factors. The city pointed out that the average of Josephson's recalculated off-balance factors for 1997 to 2009 was 1.023, higher than both the uniform off-balance factor the BWC adopted in 2010 and the 1.018 average of the uniform off-balance factors the BWC had adopted for the six years since 2010. The city also pointed out that Josephson's recalculated off-balance factors exceeded the 1.01 off-balance factor for 9 of the 13 years for which he calculated an off-balance factor. Further, due to missing data, Josephson used a different method to recalculate the uniform off-balance factors for years 1997 to 2002 than he did for 2003 to 2009. To recalculate off-balance factors for 1997 to 2003, Josephson used an average of data from 2006 and 2009 to create a single "selected factor" that was used to recalculate off-balance factors for 1997 to 2002. If Josephson had used an average of the data from all of the years for which data was available (2003 to 2009) when calculating the off-balances for 1997 to 2002, the recalculated off-balance factors would have been lower and the premium impact for those years would have been higher than what Josephson calculated. Josephson testified that his assumptions were actuarially sound and that he used the data from 2006 and 2009 to recalculate off-balance factors for 1997 to 2002 because he believed they would be "a better measure" for the years he was trying to project than data from other years.

{¶127} As the foregoing demonstrates, Schwartz and Josephson disagreed both as to the assumptions and methodology to be used in calculating the effect of group rating on the city's premiums. Nevertheless, each expert was deemed to be qualified to opine upon the actuarial issues in this case. Each party presented a case for why its expert's approach was the better approach. The trial court was in the best position to determine the credibility of the witnesses

and the weight to be given their testimony, including their proposed calculation of the restitution amount. *Kalain v. Smith*, 25 Ohio St.3d 157, 162, 495 N.E.2d 572 (1986).

{¶128} The BWC also contends the trial court's restitution award was against the manifest weight of the evidence because it "ignores" the fact that the city's premiums were "too low" during the years it was retrospectively rated.

{¶129} In *San Allen*, the trial court was ordered to modify its restitution award to account for subsidy benefits class members who were group rated during part of the class period received during the years in which they were group rated. The court held that because it was "the group-rated employers (including, for the years in which they were group rated, class members who participated in the BWC's group rating plan) who truly benefitted under the BWC's group rating plan," i.e., "receiving a windfall in the form of substantially reduced premiums subsidized by nongroup-rated employers," "[c]onsideration of the 'totality of the circumstances' and 'sum of the equities'" required the trial court to account for those subsidy benefits when determining the amount of restitution to be awarded to the plaintiff class. *San Allen* at ¶ 135-136. In *San Allen*, unlike in this case, certain of the plaintiffs had directly benefitted from the very unlawful group-rating system from which they sought equitable restitution. The court held that those benefits had to accounted for when determining the amount of restitution to be awarded the plaintiff class.

{¶130} This case is different. As Carlson testified, the "shortcomings" in the BWC's retrospective-rating plan "had nothing to do with group rating." The fact that, for a period of time, the BWC did a poor job of estimating costs under its retrospective- rating plan and, in hindsight, allegedly charged the city lower minimum premiums than it should have been charged was a factor the trial court could have considered in determining an appropriate restitution award.

However, on the record before us, we cannot say that the trial court, when considering the "totality of the circumstances" and equities in this case, was required to account for those alleged "undercharges" when determining the amount of restitution to award the city.

**{¶131}** After reviewing the entire record, we find that the trial court's $4,524,392 restitution award was supported by substantial competent, credible evidence and was not against the manifest weight of the evidence. This is not a case in which the trial court's judgment created "such a manifest miscarriage of justice" that it must be reversed. Accordingly, the BWC's fourth and fifth assignments of error are overruled.

**{¶132}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR